JAY I. JULIEN AND ANN W. JULIEN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOEL FABIANI AND AUDREE FABIANI, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 24238–81, 26855–81.     Filed March 20, 1984.

*Jay I. Julien*, for the petitioners.
*Kendall C. Jones*, for the respondent.

NIMS, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| 24238–81 | Jay I. Julien | 1973 | $6,148 |
| | and Ann W. Julien | 1974 | 5,671 |
| | | 1975 | 8,220 |
| | | 1976 | 3,738 |
| 26855–81 | Joel Fabiani | 1974 | 8,692 |
| | and Audree Fabiani | 1975 | 12,349 |
| | | 1976 | 163 |

By amended answer, respondent asserts an increased deficiency in petitioners Joel and Audree Fabiani's income taxes for the taxable year 1976 in the total amount of $2,974.87.

After concessions, the issues for decision are:

(1) Whether petitioners have substantiated the existence of loans whose proceeds were purportedly used to purchase silver in 1973, 1974, and 1975;

(2) Whether, if the loans existed, they were applied to transactions lacking in economic substance such that no interest on those loans is deductible under section 163(a);[1] and

(3) Whether, if the alleged transactions had economic substance, gain realized in the second year of each transaction should be characterized as short-term gain.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and the exhibits attached thereto are incorporated herein by this reference, except as modified, *infra*.

Petitioners Jay I. Julien (Julien) and Ann W. Julien, husband and wife, and petitioners Joel Fabiani (Fabiani) and Audree Fabiani, husband and wife, resided at New York, N.Y., at the time their respective petitions were filed. Ann W. Julien and Audree Fabiani are parties solely by virtue of having filed joint returns with their respective spouses for the years in question.

Julien is an attorney, theatrical producer, and business manager. Fabiani is an actor and announcer. During the years in issue, Julien acted as Fabiani's business manager and was

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.

responsible for investing Fabiani's funds. Petitioners are cash basis taxpayers.

Julien began trading in commodity futures for himself and Fabiani with Kroll, Dalon & Co., Inc. (Kroll, Dalon), in 1971. Kroll, Dalon specialized in the trading of commodity futures. Stanley Kroll (Kroll) was the sole owner of Kroll, Dalon from 1971 through 1974. During this period, Ralph Sorrentino (Sorrentino), Kroll, Dalon's back-office manager, was responsible for executing transactions according to Kroll's instructions.

Julien and Fabiani allegedly engaged in a series of transactions and loans involving the trading of commodity futures. Documents purporting to verify this trading show Julien entering into three respective series of transactions in 1973–74, 1974–75, and 1975–76. Similarly, Fabiani engaged in two series of transactions in 1974–75 and 1975–76, respectively. Each series of transactions is separately discussed below.

## 1. 1973–74 Transaction Series

In April 1973, Kroll discussed with Julien the possibility of Julien's undertaking a set of transactions involving the purchase of a large amount of silver bullion, or "spot"[2] silver, in London, England. The entire purchase price of the silver would be borrowed by Julien from or through Kroll, Dalon. Simultaneously, Julien would sell short[3] the same quantity of silver for delivery at a specified future date.

Julien proceeded with the plan and subsequently received from Kroll, Dalon confirmation documents describing two trades. The first document, dated July 2, 1973, confirms a purchase by Julien of 140,000 ounces of London spot silver at a total cost of $377,440. The second confirmation, dated July 3, 1973, shows the short sale by Julien of 140,000 ounces of London silver for July 3, 1974, delivery at a total price of $403,200.

In conjunction with the above transactions, Kroll, Dalon issued to Julien on July 2, 1973, a document entitled "Com-

---

[2]The term "spot" refers to a contract to buy silver available for immediate or nearly immediate delivery as opposed to delivery in the future.

[3]For purposes of this case, selling short involves the selling of a contract to deliver silver at a specified future date at a stated price.

modity Margin Call." The document states that "Commodity margin calls are due on day of trade" and indicates $2,250 as the total amount due.

Over a month later, on August 16, 1973, Julien paid $2,250 to Kroll, Dalon. An August 20, 1973, Kroll, Dalon "Statement of Account" issued to Julien reflects the $2,250 payment.

On December 26, 1973, Julien paid $26,554.40 to Kroll, Dalon. Kroll, Dalon issued a statement of account dated December 28, 1973, stating that an interest payment of $26,554.40 had been received from Julien.

On January 2, 1974, Kroll, Dalon paid Julien $26,500. A statement of account dated January 4, 1974, issued to Julien by Kroll, Dalon lists the amount paid to Julien as a cash disbursement.

In July 1974, Julien received the last documents in connection with the first transaction series. A confirmation document dated July 3, 1974, shows the sale of 140,000 ounces of London spot silver at a total price of $586,740. A statement of account dated July 3, 1974, shows the purchase of 140,000 ounces of London silver at a total cost of $586,740, thus closing out the short position entered into by Julien on July 3, 1973.

Julien deducted $25,000 as interest expense paid to Kroll, Dalon on his 1973 income tax return.[4] On his 1974 income tax return, Julien reported a $208,317 long-term capital gain and a $184,012 short-term capital loss from the transaction series.

Kroll, Dalon did not report any interest income other than interest received on obligations of the United States on its corporate income tax return for its fiscal year ended January 31, 1974.

### 2. 1974–75 Transaction Series

In 1974 Julien decided to initiate another series of transactions with Kroll, Dalon, similar to those executed in the 1973–74 transaction series. Julien, at Fabiani's request, also placed identical orders for Fabiani.[5]

---

[4]There is no explanation in the record as to why Julien limited his deduction to $25,000, whereas his interest check to Kroll, Dalon was for $26,554.40.

[5]Although Fabiani no longer has copies of his Kroll, Dalon documents, it was stipulated that Julien's documents accurately reflect the transactions Fabiani entered into with Kroll, Dalon.

A Kroll, Dalon confirmation document dated May 31, 1974, shows the purchase by Julien of 130,000 ounces of London spot silver at a total cost of $639,600. A second Kroll, Dalon document dated June 3, 1974, confirms the short sale by Julien of 130,000 ounces of London silver for June 3, 1975, delivery at a total price of $664,820.

A commodity margin call document dated May 31, 1974, again requiring payment on the day of trade, was issued to Julien by Kroll, Dalon in the amount of $2,540. On December 20, 1974, Julien paid Kroll, Dalon $2,540.

On December 27, 1974, Julien paid Kroll, Dalon $26,198.18. A Kroll, Dalon "Daily Activity Statement" dated December 31, 1974, issued to Julien shows the cash receipt of $26,198.18.

On January 2, 1975, Kroll, Dalon paid Julien $26,100. A Kroll, Dalon daily activity statement dated January 2, 1975, issued to Julien shows a cash disbursement of $26,100.

The second transaction series was completed in June 1975. A Kroll, Dalon statement of account dated June 3, 1975, issued to Julien shows the sale of 130,000 ounces of London spot silver at a total price of $664,820. A Kroll, Dalon confirmation document dated June 3, 1975, shows the purchase of 130,000 ounces of London silver at a total cost of $664,820, thus closing out the short position entered into on June 3, 1974.

On their 1974 income tax returns, Julien and Fabiani reported interest expense paid to Kroll, Dalon of $26,198 and $26,555, respectively. On his 1975 income tax return Julien reported a $23,560 long-term capital gain from the transaction series. Fabiani did not report a capital gain or loss from the 1974–75 transaction series on his 1975 income tax return.

### 3. 1975–76 Transaction Series

On January 31, 1975, Kroll advised Julien that he was closing Kroll, Dalon and "leaving the Street." Shortly thereafter, Sorrentino opened Euro-Metals Corp. (Euro-Metals) at the defunct Kroll, Dalon's address. Julien, deciding to engage in another set of transactions, authorized Sorrentino to place a series of trades in 1975–76 both for himself and Fabiani.

#### (a) Julien's 1975–76 Transaction Series

A Euro-Metals confirmation document dated June 2, 1975, issued to Julien shows a short sale of 90,000 ounces of London

silver for delivery on January 2, 1976, at a total price of 2.0430 British pounds per ounce. A second Euro-Metals document dated June 3, 1975, confirms a purchase of 90,000 ounces of London spot silver at a total cost of $401,588.89. The confirmation documents were sent to Julien on July 18, 1975, along with a copy of the following loan agreement:

We hereby confirm that the following loan has been made to you commencing 6–3–75 and terminating 1–2–76.

> Amount 172,890 Pounds Sterling
> Amount 401,588.89 U.S. Dollars
> Interest 10.887% Annual Rate

This loan is for the exclusive purpose of financing of 90,000 ounces of Silver Bullion purchased in London England for your account.

Your acceptance of this agreement will serve as irrevocable instructions to repay the principal amount of this loan directly from the proceeds of the sale of your Silver Bullion, which is to be executed on the termination date as shown above.

The lender hereby agrees to look solely to the sale of said Silver Bullion for repayment of this loan, it being understood that this loan is being made without recourse to you.

We shall debit you separately for the interest, which shall be due and payable on the date so indicated at the time of debit notice. Said payment date to be either the termination date of this loan or no later than December 15th in the year said loan was effected.

The loan agreement was signed by both Julien and Sorrentino (as president on behalf of Euro-Metals). A Euro-Metals "Commodity Margin Call" was also sent to Julien billing him for $1,795.39. The accompanying letter stated that the charges were for storage, insurance, and commissions. In July 1975, Julien paid $1,795.39 to Euro-Metals.

On December 2, 1975, Euro-Metals issued an invoice to Julien for "interest on 90,000 ounces of London silver bullion 6–3–75 thru 1–2–76" in the amount of $25,504.34. Julien paid Euro-Metals $25,504.34 on December 26, 1975.

Euro-Metals confirmation slips show a purchase by Julien of 90,000 ounces of spot silver on June 3, 1975, at a cost of $401,588.89, and the sale of the same amount of silver on June 2, 1975, for delivery on January 2, 1976, at a price of $427,093.23. The short sale was covered on January 2, 1976, at a net gain of $23,708.95.

On his 1975 income tax return, Julien deducted $25,504 as interest expense paid to Euro-Metals. Julien reported a

$23,709 long-term capital gain in connection with the 1975–76 transaction series on his 1976 income tax return.

*(b) Fabiani's 1975–76 Transaction Series*

In contrast to the 1974–75 transaction series in which Fabiani received the same documents as Julien, in the 1975–76 transaction series, Fabiani received confirmations from Rudolf Wolff & Co., Ltd. (Rudolf Wolff), a London broker.

A Rudolf Wolff "Confirmation of Contract" document dated October 31, 1975, shows a purchase by Fabiani of 254,000 ounces of London spot silver at a total cost of 508,254 British pounds for November 3, 1975, delivery. A Rudolf Wolff invoice similarly shows 254,000 ounces in the account of Fabiani.

A second Rudolf Wolff confirmation of contract document, also dated October 31, 1975, shows the short sale of 254,000 ounces of London silver for January 6, 1976, delivery at a total price of 520,795 British pounds. A commission charge of $661.74 is noted on the document.

Fabiani received the following letter from I. M. Fortescue (Finance) Ltd. (Fortescue) dated October 31, 1975:

We confirm our offer to make to you a loan ("the loan") on the following terms:

| | |
|---|---|
| Date of Advance: | 3rd November, 1975 |
| Amount: | £508,254.00 |
| Rate of Interest: | 13½ per cent per annum |
| Repayment Date: | 6th January, 1975 |

The loan is for the exclusive purpose of financing your purchase of 254000 ounces of bullion silver from Rudolf Wolff and Company Limited ("Wolff") and is conditional upon your agreeing to charge in our favour as security for repayment the benefit of the silver contracts by the delivery to us by Wolff of the silver purchase contract or contracts and a contract or contracts for the forward sale of the same quantity of silver for delivery on the Repayment Date.

We will pay the full amount of the loan to Wolff not later than twelve noon on the Date of Advance against confirmation from Wolff that the said purchase contract or contracts have been effected.

We agree to look solely to the proceeds of sale arising under the said sale contract or contracts to repay the loan.

We shall debit you separately for the interest which shall be calculated for the full period of the loan and shall be payable on 29th December, 1975.

We shall be entitled without notice to you to pledge assign sell or otherwise realise the security held by us hereunder during the period of the loan provided that the security is made available for delivery to Wolff on the Repayment Date to meet the forward sale contract.

The loan is on the express basis that no repayment of the loan may be made by you prior to the Repayment Date except with our express written approval to be given or withheld at our entire discretion.

Your instructions to Wolff for the said purchase contract or contracts shall constitute your acceptance of the above terms and your agreement with us to create the charges referred to above and your authority to Wolff that Wolff shall treat us as if we were entitled to the benefit of the said contracts and remit to us the proceeds of sale under the sale contract or contracts for your account.

Fabiani paid Fortescue $24,996.81 on December 23, 1975. Fabiani deducted this amount as interest expense on his 1975 income tax return.

Fabiani was advised by Rudolf Wolff that on January 6, 1976, the 254,000 ounces of London spot silver was delivered against the 254,000 ounce short sale position, thus closing out the short sale.

On January 14, 1976, Rudolf Wolff paid Fabiani $24,976.81. Fabiani did not report any capital gain or loss from the 1975–76 transaction series on his 1976 income tax return.

## OPINION

This case involves the so-called "cash and carry tax shelter." See S. Rept. 97–144, 97th Cong., 1st Sess. (1981) (to accompany H.R. 4242, the Economic Recovery Tax Act of 1981 (ERTA)), 1981–2 C.B. 412, 473. Section 263(g) was added to the Code as a part of ERTA, and it deals with cash and carry straddles put on after June 23, 1981, in tax years ending after that date. Sec. 502, Pub. L. 97–34, 95 Stat. 327. Therefore, since the case before us involves calendar years prior to 1981 for both sets of petitioners, we must decide the case under the law as it existed prior to that year.

As described in the aforementioned Committee report (1981–2 C.B. at 473), cash and carry tax shelters usually involve the purchase of a physical commodity, such as silver, and the acquisition of a futures contract to deliver (sell) an equivalent amount of the same commodity at a date sufficiently in the future to achieve long-term capital gain treatment on the sale.[6] The taxpayer typically finances the purchase with borrowed funds and deducts the interest expense, storage, and

---

[6] In the years before the Court, this period was 6 months and 1 day.

insurance costs in the first year. If allowable (an issue we must here decide insofar as interest is concerned), these deductions offset other ordinary income.

Because the price differential between the current price of the physical commodity (in this case, silver) and the price of the futures contract for a distant month is largely a function of interest or other carrying charges, the futures contract will have a value approximately equal to the total payment for the physical commodity plus interest and carrying costs. The taxpayer will hold the silver and the offsetting futures contract into the next year.

When the long-term gain holding period has passed, the taxpayer will close out both positions realizing simultaneously a long-term gain and a short-term loss. In either event, the net gain in the two positions will be about equal to the interest and carrying charges but will be treated as long-term capital gain.[7]

The strategy employed by Julien and Fabiani closely parallels the form of transaction outlined in the ERTA Senate report, from which the above description of cash and carry shelters is derived. For example, Julien's transactions reveal the following:

|  | *1973–74* | | *1974–75* | | *1975–76* | |
|---|---|---|---|---|---|---|
| Sold short | $403,200 | | $664,820 | | [1]$426,060 | |
| Purchased spot | 377,440 | | 639,600 | | 401,589 | |
| Potential gain | 26,760 | | 25,220 | | 24,471 | |
| Gain reported | 24,305 | (1974) | 23,560 | (6/3/75) | 23,708 | (1/2/76) |
| Interest cost | 26,554 | | 26,198 | | 25,504 | |

[1]The Court takes judicial notice of the fact that on June 2, 1975, the date of the transaction, a British pound was worth $2.317, as reported in the Wall Street Journal for June 3, 1975. It is necessary that we do so because the parties did not stipulate the amount of this sale in U.S. dollars.

Similarly, Fabiani's transactions reveal the following:

---

[7]Sec. 263(g) (which, as stated, is not applicable to the years before the Court) requires, in general, the capitalization of carrying charges, including interest expense.

|  | 1974–75 | 1975–76 |
|---|---|---|
| Sold short | $664,820 | $1,058,776 |
| Purchased spot | 639,600 | 1,033,280 |
| Potential gain | 25,220 | 25,496 |
| Gain reported | 23,560 (6/3/75) | 0 |
| Interest cost | 26,198 | 24,997 |

The questions presented for decision are whether petitioners' interest expense deductions are allowable and whether the long-term gains should be reclassified as short-term gains.

Petitioners contend that the transactions under scrutiny are bona fide and had economic substance. They also contend that there is no basis in the statute or case law for reclassifying the long-term gains as short-term gains.

Respondent argues that the interest deductions should be disallowed because petitioners have failed to prove that the transactions actually occurred and because the transactions, if they did in fact occur, lacked economic substance. Further, respondent argues "alternatively," the long-term gains should be reclassified as short-term gains. This argument is based upon the theory that, for purposes of section 1233, the underlying asset is substantially equivalent to the short-sale contract for the delivery of that asset. On brief, respondent does not choose to explain why this argument is made alternatively, the effect being to concede that the petitioners correctly characterized the gains if the interest deductions are disallowed. Since we in any event hold for respondent on the first issue, suffice it to say that we can perceive of no conceptual relationship between the section 1233 issue thus raised and the question of lack of economic substance.

In Rev. Rul. 80–324, 1980–2 C.B. 340, the Commissioner of Internal Revenue took the position that an investment prospectus, canceled checks, and confirmation statements issued in connection with an investment in futures contracts with a foreign investment firm are insufficient to substantiate the existence of transactions entitling the taxpayer to a loss deduction. In the case under consideration, no foreign investment corporation's records of the taxpayers' transactions could be made available for examination. While the revenue ruling is not, of course, precedential here (*Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142 (5th Cir. 1971)), we must observe that the paucity of proven facts from overseas in

the case before us would fully justify skepticism of the type manifested by the Commissioner in Rev. Rul. 80–324.

In his opening statement, respondent asserted that the petitioners in each case, at a cost of several thousand dollars each year, expected to obtain interest deductions substantially in excess of $20,000 for each such year. We think the record before us amply supports the conclusion that, although petitioners purported to effectuate loans with which to buy silver bullion, there was no silver and there were no loans.[8]

The transactions in question were contrived and effectuated by Julien and Stanley Kroll beginning sometime in 1973 and continuing to January 31, 1975, when Kroll wrote Julien to advise him that "I'm closing Kroll, Dalon and leaving the Street." Thereafter, the scheme was perpetuated, insofar as Julien was concerned, by Julien and Ralph Sorrentino, Kroll's erstwhile office manager, who continued the operations through an entity called Euro-Metals Corp. Sorrentino is now deceased. Fabiani continued his participation in the scheme through Rudolf Wolff & Co., Ltd., and I. M. Fortescue (Finance) Ltd., both headquartered in London, England. A stipulated "Confirmation of Contract" reveals that in 1975, Rudolf Wolff also maintained an office at 295 Madison Avenue in New York City, and a handwritten notation, source unknown, gives the telephone number of that office.

Commencing in 1973, Julien and Fabiani purported to simultaneously (or nearly so) purchase silver bullion and sell the same amount short for delivery at a date over 6 months later and in the following year. The short sales were covered, and the spot silver disposed of, in every case so as to achieve an excess of long-term gain over short-term loss in exactly the amount of the difference between the cost of the original spot silver purchased and futures contract sold. This pattern was repeated by both Julien and Fabiani until January 1976, when they both closed out their positions. The purchases of the

---

[8]As discussed below, we have considered the purported substance of the Fabiani 1975–76 transactions because the London broker with whom he dealt directly could not be subpoenaed to testify. In this connection, an agent of the respondent both wrote to and called on F. L. Holford, the managing director of Rudolf Wolff in London, to ascertain whether a responsible representative of Wolff would testify voluntarily at the trial of this case in New York. The agent was referred to Townley & Updike, Wolff's New York counsel. At the trial, a partner of Townley & Updike appeared for the purpose of resisting the Government's efforts to summon Wolff by means of a subpoena served on Rudolf Wolff Commodities Brokers, Inc., a New York corporation.

bullion (spot silver) purportedly were financed by loans arranged by the brokers.

Notwithstanding the fact that the loans were represented to be, in each case, in the mid-to-upper six figures or more, there is no documentation of the Kroll, Dalon loans to Julien and Fabiani. As to the Fabiani-Wolff transaction, there is a letter agreement from Fortescue to Fabiani dated October 31, 1975, which recites that the loan (for 508,254 British pounds) was to be for a fixed rate of interest, nonrecourse and nonprepayable. The loan, representing 100 percent of the purchase price of silver bullion purportedly purchased by Fabiani from Wolff, was secured solely by the silver and Fabiani's short-sale contract. There is also a letter agreement between Julien and Euro-Metals having operative provisions almost identical to the Fabiani-Wolff agreement.

The only evidence that the Kroll, Dalon transactions ever took place consists of the testimony of Julien and Kroll, miscellaneous confirmation slips and account statements from Kroll, Dalon to Julien, checks from Julien to Kroll, Dalon and several checks from Kroll, Dalon to Julien. In other words, there is absolutely no evidence outside this closed circle that the transactions took place, notwithstanding the representations of Julien and Kroll that the silver purchases and short sales were transacted through London brokers.

Kroll owned and completely controlled Kroll, Dalon. He testified that insofar as he could recall the transactions in question were negotiated through several London firms, including Sharps, Pixley & Mocatta Goldsmid, but there is no documentary evidence to support this assertion.

Insofar as the purported loans were concerned, Julien testified that they were "probably" made by Kroll, Dalon, and Kroll testified that they were made by Kroll, Dalon. However, petitioners produced no loan documents, and Julien admitted that there were no loan documents in his customer file at Kroll, Dalon. Julien could not remember the interest rate, but he thought it was "between ten and eleven percent."

We are asked to believe that three payments by Julien to Kroll, Dalon in December 1973 and December 1974, respectively, and to Euro-Metals in December 1975, constituted interest. These payments were $26,554.40 on December 26, 1973, $26,198.18 on December 27, 1974, and $25,504.34 on December

26, 1975. The credibility of Julien's testimony on this point is vitiated by the fact that Kroll, Dalon promptly paid Julien $26,500 on January 2, 1974, and $26,100 on January 2, 1975. The record does not indicate that, unlike the payments by Kroll, Dalon to Julien in January 1974 and January 1975, there was any quick repayment by Euro-Metals to Julien in 1976. However, Julien allegedly realized a $25,504.34 capital gain on January 2, 1976, before taking into account $1,795.39 in commissions and storage and insurance. The interest expense claimed in 1975 was also $25,504, so it is apparent that Julien expected to obtain a 1975 deduction in this amount at a net out-of-pocket cost of $1,795.39.

While Kroll testified that the Julien loans were made by Kroll, Dalon, he was forced to concede, when confronted with the Kroll, Dalon 1973 Federal tax return, that the $26,554.40 which Julien claimed as a deduction for interest on his Kroll, Dalon loan was not reported by Kroll, Dalon as interest income on its return.

Julien paid out separately the following amounts to Kroll, Dalon and Euro-Metals as commissions during the years in question: 1973, $2,250 (Kroll, Dalon); 1974, $2,540 (Kroll, Dalon); and 1975, $1,795.39[9] (Euro-Metals). According to Kroll, these payments to Kroll, Dalon represented its profit in the transactions. Thus they could not have represented margin requirements against risk of loss or guarantee of performance by Julien.

The first 1973 trade was effected on July 2, 1973, but the commission was not paid until August 16 of that year. In 1974, the first silver trade occurred on May 31, but the $2,540 commission was not paid until December 30. However, Julien did pay the Euro-Metals $1,795.39 commission by check on June 3, 1975, the date on which the Euro-Metals cash and carry spread was allegedly put on. None of the cash and carry straddles at any time required any margin, for the obvious reason that since the results were prearranged at the outset, there was zero risk to both the investors and the brokers. This is illustrated, for example, by Julien's 1975 Euro-Metals spread, as reflected on his confirmation slips and a "corrected statement," as follows:

---

[9]This amount includes $191.62 as "STGE & INS."

| Date | Bought | Sold | Commodity | | Debit | Credit |
|------|--------|------|-----------|---|-------|--------|
| 6/2/75 | | 90M OZ | Jan. 2, 1976 London Silver | | | $427,093.23 |
| 6/3/75 | 90M OZ | | Silver bullion | | | 401,588.89 |
| Gross profit | | | | | | |
| Less: | | commission | $1,603.77 | | | 25,504.34 |
| | | Stg & ins | 191.62 | | | |
| Net profit | | | | | | 23,708.95 |

The above sale and purchase figures were reflected on confirmation slips bearing the dates indicated. The gross profit, commission, etc., figures were reflected on the corrected statement which indicates that Julien sold actual silver on January 2, 1976. Notwithstanding the fact that the corrected statement is dated January 2, 1976, Julien paid the exact amount of the $25,504.34 gross profit as "interest" by a check to Euro-Metals dated December 26, 1975. Since Julien had already paid the $1,795.39 commission and expenses by separate check on June 3, 1975, the correct net profit should have been shown as $25,504.34, and the stipulated corrected statement contains a handwritten notation to that effect.

We also note that while the Euro-Metals corrected statement and one of the Kroll, Dalon statements make references to storage and insurance, the record is devoid of any warehouse receipts or insurance policies, which, if produced, would have been positive indicia that the silver actually existed.

While, as previously stated, Sorrentino, the president of Euro-Metals, died prior to the trial of this case and was therefore not available to testify, Julien made no effort to produce the books and records of Euro-Metals or any other witness to authenticate them. Since Sorrentino was Kroll, Dalon's office manager prior to its closing, and Euro-Metals continued to operate in Kroll, Dalon's office location, the books and records might well have been available, but Julien gave no explanation for their absence. For reasons already indicated, we are unwilling to accept Julien's copies of Euro-Metals statements as reflecting actual transactions without some objective proof that the transactions actually took place, which evidence was not forthcoming.

In short, all of the cash and carry straddles negotiated by Julien through Kroll, Dalon and Euro-Metals were prear-

ranged at the outset for the sole purpose of obtaining unjustified interest deductions in the years of inception and long-term capital gains in subsequent years. Furthermore, we are not convinced that any actual purchases of spot silver or short sales of silver by Julien ever took place. Rather, we regard the entire exercise as a fraudulent sham orchestrated for the sole purpose of achieving the results described. Julien's 1973, 1974, and 1975 interest deductions are therefore disallowed.

The parties have stipulated that "Fabiani no longer has copies of any relevant Kroll, Dalon documents, but it is agreed that his documents reflected transactions identical to Jay Julien's (Docket No. 24238–81) 1974–1975 transactions." Fabiani, himself, did not testify or offer any additional evidence regarding his alleged 1974–75 Kroll, Dalon transactions. Since we have held that Julien's 1974–75 Kroll, Dalon transactions were shams, we likewise hold that Fabiani's 1974–75 Kroll, Dalon transactions were shams. Accordingly, Fabiani's 1974 interest deduction is not allowable.

We turn now to Fabiani's 1975–76 cash and carry transactions which were allegedly negotiated through Rudolf Wolff and Fortescue. On his 1976 return, Fabiani reported a series of silver bullion transactions resulting in a long-term loss of $80,240 and a long-term gain of $80,240 (a remarkable coincidence in itself). Respondent has allowed these transactions as reported. In addition, Fabiani purportedly realized a gain of $24,834 from a cash and carry silver straddle closed out on January 6, 1976, which he failed to report on his 1976 return.[10]

On October 31, 1975, Fabiani purportedly made a purchase of 254,000 ounces of spot silver at a cost of 508,254 British pounds, which, at a conversion rate of $2.033, was the equivalent of $1,033,280. On the same day he sold short the same amount of silver for January 6, 1976, delivery, at a price of 520,795 British pounds which, at the conversion rate of $2.033, was the equivalent of $1,058,776. Commissions on the total transaction were $662. On January 6, 1976, the straddle was closed by the application of the 254,000 ounces of spot silver against the short sale, resulting in a net gain of $24,834,

---

[10]The parties stipulated the details of this particular straddle twice, each version varying slightly from the other. As to the Fabiani-Wolff transactions, we have based our findings and conclusions on documents in evidence and disregarded the parties' stipulated characterizations of the transactions.

representing the amount realized on the short sale ($1,058,776) less the cost of the spot silver ($1,033,280) and commissions ($662).

Fabiani borrowed the 508,254 British pounds, the equivalent of $1,033,280, for the purchase of the spot silver from Fortescue. This loan was evidenced by a loan agreement between Fabiani and Fortescue, apparently an affiliate of Wolff. The loan was for a period of 64 days, from November 3, 1975, to January 6, 1976, and bore interest at the rate of 13½ percent per annum, payable on December 29, 1975. The loan was nonrecourse and secured solely by the spot silver purchased and the forward (futures) contract negotiated through Wolff. Under the agreement, Fortescue could use the collateral as it saw fit during the term of the loan, and the loan could not be prepaid without the written approval of Fortescue, which was within the latter's "entire discretion."

On November 3, 1975, Fortescue billed Fabiani for the $24,996.81 interest on the loan, which Fabiani paid to Fortescue by check dated December 19, 1975, drawn on the Bank of California. The check was deposited by Fortescue to its account at American Bank & Trust Co. in New York, which bank in turn deposited Fabiani's money, less a $20 service charge, to Wolff's account at Bankers Trust Co. in New York. On January 14, 1976, Wolff transferred $24,976.81 back to Fabiani's account at the Bank of California.

No explanation was offered as to the reason for the repayment of the $24,976.81 by Wolff to Fabiani. None of the Wolff documents indicate on their face that Fabiani paid any margin, storage costs, or insurance. Commission was charged on the forward contract at 0.000625 percent, or $661.74 ($1,058,776 × 0.000625). On their 1975 return, the Fabianis claimed a deduction for interest paid to "J. M. Fortescue Co." of $24,997. Thus, the entire transaction was put in place on October 31, 1975, with the result predetermined, namely, a $24,997 interest expense to be claimed as a deduction in 1975, and a $24,834 capital gain to be realized in 1976, all at an out-of-pocket cost of $662 (the $20 bank service charge on December 24, 1975, was perhaps unforeseen).

The picture thus presented is a grotesque distortion of the orthodox commodity straddle.[11] In general, a straddle is the purchase of one commodity future against the sale of another. See G. Gold, Modern Commodity Futures Trading 266 (rev. 7th ed. 1975).[12] It seems self-evident that, in any commodity straddle, a legitimate investor must have some potential of making money as a result of various market forces and, by the same token, be a risk of losing money. One commentator has said that "A commodity straddle is held in the expectation of profiting from a change in the 'spread' or 'premium,' the difference in price between two futures contracts. While the price movements of the two contracts will have some relationship to each other, as the prices will be affected by similar economic conditions, neither in theory nor in practice are the fluctuations identical." See R. Dailey, "Commodity Straddles in Retrospect: Federal Income Tax Considerations," 47 Brooklyn L. Rev. 321 (Winter, 1981). Presumably, fluctuations would also occur in a case where the investor holds silver bullion against a forward contract, if the end result were not, as here, prearranged.

The aforementioned commentator points out four factors which influence the increase or decrease in forward spreads in silver straddles, these being: (1) The price trend of silver; (2) the supply of silver; (3) fluctuating interest rates; and (4) the number of futures contracts outstanding. R. Daily, *supra* at 322 n. 33. The investor's potential for making a profit would depend upon how successfully he takes advantage of these various market forces.

In the case before us, none of the foregoing factors could possibly have come into play, because Fabiani was totally immobilized by the Fortescue loan agreement. Both the spot silver and the forward contract were pledged to secure the loan, the loan could not be prepaid without the consent of

---

[11] As noted in note 8, Fabiani in 1975 and 1976 dealt directly with Rudolf Wolff, a London broker not within the subpoena power of this Court. So that petitioners Fabiani will in no way be prejudiced by the unavailability of a key witness (notwithstanding the fact that petitioners have the burden of proof), we proceed on the supposition that the Fabiani-Wolff-Fortescue documents reflect actual transactions.

[12] There appears to be a paucity of discussion of cash and carry straddles in the commodity literature, except in an income tax context. See, for example, section entitled "Cash-and-Carry Transactions" in F. Fabozzi & F. Garb, Handbook of Financial Markets: Securities, Options, Futures 740 (1981), which discusses only the tax, but not the commercial, aspects of cash and carry straddles.

Fortescue, the interest rate was fixed at 13½ percent, and interest on the principal for the entire 64 days was required to be paid. Thus, there was no way Fabiani could have made a profit or incurred a loss by virtue of any periodic widening or narrowing of the spread, since at no time during the period of the loan could he have closed out his long position or short position or both, or in any way restructured the straddle.

Fabiani does not argue, nor could he, that there was any other way to make a profit in the 1975–76 straddle.[13] The straddle, therefore, served no purpose beyond generating an interest deduction (Fabiani reported no capital gain as a result of closing out the straddle in 1976). "Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction." *Goldstein v. Commissioner*, 364 F.2d 734, 742 (2d Cir. 1966). Fabiani's 1975 interest deduction is therefore disallowed.

Since we have determined that no interest deductions are allowable to petitioners for any of the years in question, we need not decide the capital gain issue raised in the alternative by respondent.

To reflect concessions,

*Decisions will be entered under Rule 155.*

---

[13]Fabiani also does not argue that the transactions served any nonbusiness personal purpose.