BURT GANZ and ROCHELLE GANZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ganz v. Commissioner
Docket No. 43167-85
United States Tax Court
T.C. Memo 1990-243; 1990 Tax Ct. Memo LEXIS 250; 59 T.C.M. (CCH) 604; T.C.M. (RIA) 90243; May 21, 1990, Filed *250 Decision will be entered for the respondent. Bernard Kobroff, for the petitioners. Michael D. Wilder, for the respondent. TANNENWALD, Judge. TANNENWALD
*846 MEMORANDUM FINDINGS OF FACT AND OPINION *251 Respondent determined a deficiency in petitioners' Federal income tax for the taxable years 1973 and 1974 in the amounts of $ 5,026 and $ 3,424, respectively, and, pursuant to section 6621(c), [1] formerly section 6621(d), an increased interest rate for the underlying deficiencies. The issues for decision are whether certain "cash and carry" silver transactions were bona fide, and, if so, whether the transactions lacked economic substance, and whether the alleged transactions were tax motivated within the meaning of section 6621(c). [2]
FINDINGS OF FACT *252 Some of the facts have been stipulated, and the stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioners resided in Westbury, New York, at the time of the filing of their petition. They filed joint Federal income tax returns for 1973, 1974, and 1975 with the Internal Revenue Service *847 Center at Holtsville, New York. Unless otherwise indicated, all references to petitioner are to Burt Ganz. During the years 1968 through 1975, petitioner allegedly invested in London silver bullion cash and carry transactions (hereinafter sometimes referred to as "the Ganz transactions") through Kroll, Dalon & Co., Inc. (Kroll), a New York commodity brokerage firm. During the years in issue, Kroll allegedly executed the Ganz transactions on the London Metal Exchange through J. H. Rayner (Mincing Lane) Ltd. (Rayner), a London based commodity investment firm. The alleged transactions between Kroll and Rayner were executed on the basis of principal to principal; in other words, Kroll did not disclose whether it was acting for customers or, if so, their identity when it placed orders with Rayner. Confirmation documents issued by Kroll to petitioner describe *253 the Ganz transactions as follows: Total Price/
Date
Purchased/Sold
Item
Price Per Oz.
First Set of Transactions
12/1/72
Purchased
60,000 oz. silver
$ 112,080
1.8680
12/4/72
Sold
60,000 oz. silver
120,600
for delivery on 12/4/73
2.0100
12/4/73
Purchased
60,000 oz. silver
182,700
3.0450
12/4/73
Sold
60,000 oz. silver
190,020
for delivery on 9/4/74
3.1670
9/4/74
Purchased
60,000 oz. silver
239,640
3.9940
9/4/74
Sold
60,000 oz. silver
241,920
4.0320
Second Set of Transactions
12/18/73
Purchased
40,000 oz. silver
127,280
3.1820
12/19/73
Sold
40,000 oz. silver
133,880
for delivery on 12/18/74
3.3470
12/18/74
Purchased
40,000 oz. silver
178,280
4.4570
12/18/74
Sold
40,000 oz. silver
178,880
for delivery on 1/18/75
4.4720
1/20/75
Purchased
40,000 oz. silver
178,880
4.4720
1/20/75
Sold
40,000 oz. silver
178,880
4.4720
Confirmation documents from Rayner to Kroll describe the purchase and sale of silver bullion as follows: Date
Purchased/Sold
Item
Price Per Oz.
1/8/73
Purchased
180,000 oz.
$ 1.9840    1/8/73
Sold
180,000 oz.
2.1310    for delivery
1/9/74
10/17/73
Purchased
800,000 oz.
2.9040    10/17/73
Sold
800,000 oz.
3.0570    for delivery
10/17/74
12/18/74
Purchased
40,000 oz.
4.4570    12/18/74
Sold
40,000 oz.
4.4720    for delivery
1/18/75
*254 The following appears on the back of the first four confirmations from Rayner: CERTIFIED TO BE A TRUE COPY OF THE TYPED/MANUSCRIPT ORIGINAL RECORD HELD BY J. H. RAYNER (MINCING LANE) LIMITED. *848 /s/ D. P. HULL 4.2.77.
The last two confirmation documents do not bear any certification. Invoices from Kroll to petitioner reflect interest charges as follows: Invoice Date
Amount
Period
12/1/72  $ 8,797.80
12/1/72 to 11/30/73 12/1/73  8,797.80
12/1/73 to 11/30/74 12/18/73 6,767.32
12/18/73 to 11/17/74
12/18/74 611.84
12/18/74 to 1/20/75 On December 31, 1973, petitioner issued two checks to Kroll, one in the amount of $ 8,797.80 and the other in the amount of $ 6,767.32. On January 8, 1974, Kroll issued two checks to petitioner, one in the amount of $ 9,119.70 and the other in the amount of $ 13,127.71. On January 8, 1974, petitioner issued a check to Kroll in the amount of $ 237.25, and on January 31, 1975, petitioner issued a check to Kroll for $ 611.84. Kroll issued the following checks to Rayner: Date
Number
Amount
8/9/72
1470
$  1,986.10
10/31/72
1562
5,900.00
11/2/72
1568
7,600.00
3/7/73
1041
10,600.00
3/7/73
1043
200.00
10/26/73
1264
2,250.00
11/16/73
1280
8,250.00
3/7/74
1419
3,900.00
3/7/74
1420
7,800.00
*255 Petitioners claimed deductions of $ 15,565.00 for 1973 and $ 612.00 for 1975 as interest expenses from the alleged London bullion market cash and carry silver transactions. Petitioners reported capital losses of $ 735.00 for 1973 and $ 13,465.00 for 1974 and capital gains of $ 25,488.00 for 1975 from the cash and carry silver transactions. In his notice of deficiency, respondent eliminated the gains and losses and disallowed the interest deductions. A grand jury investigation was conducted regarding cash and carry silver transactions, including transactions in London, and among the brokerage houses interviewed was Rayner. A purpose of the grand jury investigation was to determine if the transactions actually occurred and to correlate the records of Rayner with the records of its customers, such as Kroll. The grand jury did not return an indictment against Kroll or its president Stanley Kroll or petitioner. OPINION This case involves cash and carry transactions of silver bullion purportedly executed on the London Metal Exchange. The manner in which such transactions are constructed is set forth in Julien v. Commissioner, 82 T.C. 492, 499-500 (1984), and *256 we see no purpose in repeating what we said there. We simply note that the transactions herein involved purported purchases of spot silver and purported simultaneous sales of silver for future delivery. We also note that, as was the case in Julien, the instant case involves calendar years prior to 1981, and therefore section 263(g), added to the Code by the Economic Recovery Tax Act of 1981, sec. 502, Pub. L. 97-34, 95 Stat. 327, is not applicable. See 82 T.C. at 499. Essentially two questions are presented for decision: (1) whether the transactions were bona fide, and (2) if they were, did they have economic substance. Petitioners assert that both these questions should be answered in the affirmative and that consequently they are entitled to the claimed deductions for losses and interest on purported loans to carry the spot silver. Respondent takes the opposite view. The burden of proof as to both issues is on petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Burrill v. Commissioner, 93 T.C. 643, 658 (1989). *257 We deal first with the question of the bona fides of the purported transactions, i.e., whether they in fact occurred. Aside from written confirmations and the testimony of petitioner and Stanley Kroll, there is no written documentation of any of the elements of the transactions, such as order slips either from petitioner to Kroll or from Kroll to Rayner. Granted that transactions of the type involved herein are often carried on by telephone, the total absence of any written evidence of the placement of orders is disturbing, particularly in light of the fact that telexes may well have been used in accordance with practice in the trade, and the dearth of other written evidence that might have been expected to exist. Thus, no warehouse receipts, insurance binders or policies, or evidence of payment of storage charges were submitted. We again recognize that such documents are not always available and that, since petitioner purchased the spot silver on margin, he would not be likely to be in possession of such evidence. But the fact of the matter is that corroborative testimony as to the existence of the silver in London and other matters by a representative of Rayner familiar *258 with the transactions could have been, but was not, produced. The absence of such testimony assumes even greater significance when one takes into account that, unlike the situation with United States Commodity Exchanges, no clearing house existed to guarantee that transactions on the London Metal Exchange were executed. The fact that Rayner had a general reputation for solidity and reliability is not sufficient to fill the gaps in the record. Similarly, the fact that most of the confirmation slips from Rayner to Kroll bear a certification by an employee of Rayner does not *849 constitute sufficient evidence that Rayner executed the transactions in question; the certifications are simply evidence that the confirmation slips existed in the books and records of Rayner. Documents purporting to reflect transactions by Rayner for the account of Kroll on September 19, 1972, and January 8, 1973, are subject to the same infirmity. We are further disturbed by the absence of any loan or margin agreements covering the acquisition of spot silver despite Stanley Kroll's testimony that it was customary to require a customer to execute loan and margin agreements. He could not, however, remember *259 whether petitioner ever signed any such agreements, and petitioner's own testimony was not only vague but contradictory in this regard. Moreover, we think it significant that Kroll reported no interest income other than from the United States and its instrumentalities for its taxable year ending January 31, 1974, which included the month of December 1973 when petitioner made the payments. Furthermore, Stanley Kroll did no more than give general testimony that the transactions with petitioner were executed. He did not testify that he had executed the transactions personally, nor did petitioners produce any other employee of Kroll who could have testified from personal knowledge that such executions actually occurred. Finally, we note that there is a close correlation between the amount of the payments by Kroll to petitioner on January 8, 1974 ($ 22,247.41), and the total amount of the three alleged interest payments from petitioner to Kroll in December 1972, and on December 31, 1973 ($ 24,362.92); the general testimony that the former amount represented the excess of petitioner's margin requirements was not corroborated with any analysis of the market values of petitioner's positions *260 on January 8, 1974. Of further importance is the fact that, with one exception, there is no correlation of the dates and quantities of silver reflected on the confirmations from Kroll to petitioner with those reflected on the confirmations from Rayner to Kroll. See pp. 4-5, supra. Similarly, other documents purporting to reflect transactions by Rayner for the account of Kroll exhibit the same lack of correlation. Granted that the principal-to-principal relationship between Rayner and Kroll may explain the absence of correlation as to quantities, that element does not explain the discrepancies between dates. The one exception, relating to transactions on December 18, 1974, has the same deficiency in testimonial corroboration as previously set forth and also lacks the certification which is set forth on the other Rayner confirmations. We are unimpressed with petitioners' efforts to draw supporting inferences from factors such as the claimed size of Rayner's and Kroll's operations, the certifications of the Rayner documents, the extent to which Rayner cooperated with Internal Revenue investigators, and the fact that a grand jury failed to indict Kroll, Stanley Kroll, or petitioner. *261 Aside from the fact that the foundations of petitioners' inferences are not sufficiently disclosed in the record, it does not follow that transactions with one customer were executed because transactions with other customers were. Similarly, there are many reasons why a grand jury may decide not to indict other than that the transactions in question took place. The factual pattern of the instant case is very close to that involved in Julien v. Commissioner, supra, the only difference being the existence of some foreign confirmations from the London-based Rayner. But we have only recently indicated that the mere existence of foreign confirmations will not necessarily cause us to hold that the transactions reflected therein in fact occurred. Burrill v. Commissioner, supra at 665. [3] By the same token, we recognize that the absence of direct evidence of a single element of a transaction such as is involved herein is not fatal to a taxpayer's position. The difficulty with the instant case is that, as our analysis shows, there are too many infirmities. Based upon our evaluation of the written documents and of the witnesses whom we saw and *262 heard, we conclude that petitioners have failed to carry their burden of proof that the purchases and sales of silver and the loan and margin transactions attendant thereto in fact occurred. Accordingly, respondent's disallowances of petitioners' deductions for losses and interest are sustained. Having concluded that petitioners have failed to carry their burden of proof that the transactions involved herein did occur, we find it unnecessary to consider respondent's further contention that, even if they did occur, they lacked economic substance, including the contention that the alleged payments by petitioner to Kroll in December 1972 and on December 31, 1973, did *263 not constitute deductible interest because of the repayments by Kroll to petitioner on January 8, 1974. Finally, we turn to the question whether petitioners are liable for additional interest from December 31, 1984, at the rate of 120 percent of the interest rate otherwise applicable because *850 the deficiency herein represents a substantial underpayment attributable to a "tax motivated transaction." See sec. 6621(c). Sham or fraudulent transactions are specifically defined to be tax motivated. Sec. 6621(c)(3)(A)(v). It is clear that a holding that a transaction did not occur is the equivalent of holding that it was not bona fide and thus is indistinguishable from a holding that the transaction was "sham." Bailey v. Commissioner, 90 T.C. 558, 628 (1988), on appeal (2d Cir., July 3, 1989). Nor is there any question that the increased interest rate applies to returns filed prior to the enactment of section 6621(c). Ewing v. Commissioner, 91 T.C. 396, 422 (1988); DeMartino v. Commissioner, 88 T.C. 583 (1987), affd. 862 F.2d 400, 408 (2d Cir. 1988). *264 Since petitioners have the burden of proof on the issue of the bona fides of the transactions involved herein, their failure to carry that burden is equivalent, for the purposes of section 6621(c), to a holding that the transactions were shams. See Rybak v. Commissioner, 91 T.C. 524, 567 (1988). [4] Respondent's determination in respect of increased interest under section 6621(c) is sustained. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. In an amended petition, petitioners alternatively claim a theft loss, if the transactions are found to be shams. They have not, however, pursued this claim on brief, and we consider it as having been abandoned.↩
3. See also Ostrower v. Commissioner, T.C. Memo. 1984-496↩, wherein we held that the taxpayers had not carried their burden of proof as to the underlying alleged silver transactions. There, the taxpayers relied on their own uncorroborated foreign documents without producing some independent verification and explanation of their claimed deductions.
4. See also Borrell v. Commissioner, T.C. Memo. 1989-251↩.