EDWARD A. SEYKOTA, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Seykota v. Commissioner
Docket Nos. 14936-82, 47868-86, 6720-87, 31972-87
United States Tax Court
T.C. Memo 1991-541; 1991 Tax Ct. Memo LEXIS 589; 62 T.C.M. (CCH) 1116; T.C.M. (RIA) 91541; October 29, 1991, Filed *589 Stuart E. Seigel, [2]F. Whitten Peters, Matthew D. Lerner, Marie T. Reilly, and William M. Wiltshire, for the petitioners. Theodore L. Craft, for the petitioners in docket No. 6720-87. William C. Sabin, Jr., Marsha Keyes, Kathleen E. Whatley, and C. Ted Sanderson, for the respondent. DAWSON, Judge. DAWSON
SUPPLEMENTAL MEMORANDUM OPINION On May 28, 1991, the Court filed its Memorandum Findings of Fact and Opinion in this case, adopting the opinion of Special Trial Judge Peter J. Panuthos. See Seykota v. Commissioner, T.C. Memo 1991-234. Respondent has filed a motion for reconsideration, accompanied by a memorandum in support thereof. Petitioners filed their objections to respondent's motion, and we subsequently permitted respondent to file a reply to petitioners' objections. Petitioners have filed a motion for reconsideration seeking to have the Court modify a footnote in its opinion. Respondent thereafter filed his "Response to Petitioners' Motion for Reconsideration of Footnote 32 of the May 28, 1991 Opinion." We begin by noting *590 that the granting of a motion for reconsideration rests within the discretion of the Court. We do not grant such a motion unless the moving party shows unusual circumstances or substantial error. See Vaughn v. Commissioner, 87 T.C. 164, 166-167 (1986); Estate of Bailly v. Commissioner, 81 T.C. 949, 951 (1983). This Court's policy is to hear and consider, in one proceeding, all arguments raised with respect to the issues to be litigated in order to avoid protracted and repetitious litigation. However, we clearly have authority to reconsider our opinion, particularly when the parties have tried and briefed the issue involved, and when the moving party has presented us with "persuasive reasons for doing so." CWT Farms, Inc. v. Commissioner, 79 T.C. 1054, 1057 (1982), affd. by unpublished order 755 F.2d 790 (11th Cir. 1985). 1. Respondent's Motion for Reconsideration
At issue in these consolidated cases are tax deductions arising from the Futures Trading, Inc./Merit Securities (FTI/Merit) programs. We addressed four such programs: the "Arbitrage and Carry," the T-Bond Option Markets, the T-Bill Option *591 Markets, and the Stock Forward Markets. We sustained respondent's determinations that each of those programs, with the exception of the Arbitrage and Carry program, engaged only in fictitious trades. We further sustained respondent's determination that each of the four programs lacked economic substance. Many of the "Arbitrage and Carry" transactions actually took place. That program was, fundamentally, a cash and carry tax shelter. In simplified terms, an investor would borrow large sums of money in legitimate loans from the Chase Manhattan Bank. He would acquire gold with the loan proceeds. He would also enter into contracts to sell that gold at a specified time in the future. In the gold markets, the price which the investor paid for the gold was lower than the price at which he agreed to sell that gold in the future. The differential between these two prices largely reflected the amounts of interest and other carrying charges that the investor would incur while he owned the gold. The Arbitrage and Carry customer would deduct the interest charges paid to Chase, plus other carrying charges -- such as charges for management, insurance, and storage -- in the year he borrowed *592 the money. These deductions offset other ordinary income for that year. When he sold the gold in the next year, the investor would report the gain at favorable capital gains rates. The net gain approximately equaled the costs of the interest and other carrying charges. In effect, the investor could defer the taxation of income, at rates as high as 70 percent, for a year. He could also convert that income into capital gains taxable at maximum rates no higher then 28 percent. See S. Rept. 97-144 (1981), 1981-2 C.B. 412, 473. Congress eliminated this mismatching of deductions and income in legislation that became effective for taxable years after those in issue. See sec. 263(g), added to the Code by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 502, 95 Stat. 327. As an integral part of the Arbitrage and Carry program, its promoters also placed the investors in a number of alleged trades involving options on Treasury notes. The trades were to function as alleged "hedges" against losses in the gold trades. We found those trades to be fictitious. We further found that the promoters managed the entire Arbitrage and Carry program only for tax avoidance *593 purposes. We therefore sustained respondent's determination that the Arbitrage and Carry program lacked economic substance and, thus, that its gains and losses should be disregarded for tax purposes. On brief, petitioner Edward Seykota (Seykota) argued that even if we were to hold that the Arbitrage and Carry program lacked economic substance, we should nevertheless permit him to deduct the interest that he actually paid to Chase Manhattan Bank on the loans made to finance his purchases of gold. He cited Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 92 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983), and Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989). In both of those cases the investors issued recourse notes to the promoters of tax shelter plans. We gave the notes no effect for tax purposes, holding that they constituted investments in programs that lacked economic substance. We therefore disallowed the tax credits and depreciation deductions that were based upon the investments that the notes represented. Nevertheless, the Fourth Circuit *594 in Rice's Toyota World, Inc. v. Commissioner, supra, and subsequently this Court in Rose v. Commissioner, supra, allowed the deduction of interest actually paid on those notes. As the Fourth Circuit noted, section 163 "does not limit the deductibility of * * * interest expense depending upon the item purchased by the taxpayer." Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96; see Rose v. Commissioner, 88 T.C. at 423. Respondent did not specifically respond in his reply brief to petitioners' arguments based upon Rice's Toyota World, Inc. v. Commissioner, supra, and Rose v. Commissioner, supra. In reliance upon those cases, we allowed Seykota to deduct those amounts actually shown to be interest payments on his Chase Manhattan Bank statements for the years at issue, notwithstanding our holding that the Arbitrage and Carry program as a whole lacked economic substance. In his motion for reconsideration, respondent now asks us to reconsider our allowance of the interest deduction. In his motion, respondent for the first time addresses the *595 effect of Rice's Toyota World, Inc. v. Commissioner, supra, and Rose v. Commissioner, supra. He argues that in the present case the interest deduction is the principal source of ordinary losses, while in Rice's Toyota World, Inc. v. Commissioner, supra, and Rose v. Commissioner, supra, the interest deduction was "a mere lagniappe." He urges that allowing the interest deduction would be "anomalous" when we have otherwise disregarded the gains and losses from the Arbitrage and Carry program. Although respondent addressed the interest issue somewhat inadequately in his reply brief, we have an obligation to apply the correct analysis and law to the facts in the existing record. See Louisville & Nashville Railroad Co. v. Commissioner, 641 F.2d 435, 443-444 (6th Cir. 1981), affg. on this point 66 T.C. 962 (1976). The consideration of the issues raised in respondent's motion does not require additional factual development. It is enough, for present purposes, that the Arbitrage and Carry gold program basically functioned like other "cash-and-carry" programs, *596 as the present record reveals. Having further considered the matter, we now agree with respondent that the claimed interest deductions should not be allowed. Respondent, in his notices of deficiency, eliminated for tax purposes "both gains and losses" resulting from transactions with FTI/Merit. In the case of petitioner Seykota, respondent also disallowed the deduction of expenses and interest incurred in the FTI/Merit programs "since the underlying transactions are deemed to be made only for tax avoidance." In Rice's Toyota World, Inc. v. Commissioner, supra, and Rose v. Commissioner, supra -- and originally in this case -- the Courts disagreed with respondent's determinations and allowed the deduction of interest payments that the taxpayers actually made. Here, however, on further analysis, we now believe that it is not proper to allow the deduction of the interest payments in issue. The function of the interest payments in this case distinguishes it from Rice's Toyota World, Inc. v. Commissioner, supra, and Rose v. Commissioner, supra. In those cases the investors paid interest *597 and they deducted it. The lenders retained that interest and that was the end of the matter. The fact that the loan proceeds were used to invest in transactions that lacked economic substance did not affect the deductibility of the interest under section 163. Here, however, the Arbitrage and Carry investors paid interest and deducted it, but that was not the end of the matter. Unlike the taxpayers in Rice's Toyota World, Inc. v. Commissioner, supra, and Rose v. Commissioner, supra, the investors here recovered their interest in the form of gains upon their subsequent sale of the gold they purchased. According to design, their interest payments merely functioned as the first part of a scheme for the mismatching of deductions and income. Here, because the Arbitrage and Carry program lacked economic substance, the investors' gains -- that is, their income from the program -- are disregarded for tax purposes, as are their losses. In such a situation, it would be incorrect to permit the investors to claim deductions for interest they paid as part of their costs of carrying the gold, while failing to tax them on the offsetting *598 income they received on the later sale of the gold. Instead, when the economic substance of such an alleged "mismatching" situation is in issue, we should give effect either to both the cost and the income functions, or to neither. Sheldon v. Commissioner, 94 T.C. 738, 762 (1990). The gold trading program involved here was only a part of the Arbitrage and Carry program. Seen as a whole, the Arbitrage and Carry transactions lacked economic substance or any purpose other than generating tax deductions. For tax purposes, we must therefore give effect neither to the income nor to the deductions generated by that program -- including the interest deductions now at issue. Sheldon v. Commissioner, supra; see Julien v. Commissioner, 82 T.C. 492, 508-509 (1984); see also Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965). We have considered petitioners' objections to respondent's motion but find them unpersuasive. Petitioners point out that Seykota did not pay the interest at issue to the promoters of FTI/Merit, but rather to a third-party commercial bank *599 in valid lending transactions. It is settled, however, that if the parties engage in lending transactions solely for tax avoidance purposes, the interest will not be deductible even when it is paid pursuant to an otherwise valid transaction with a commercial lending institution. See Goldstein v. Commissioner, supra; cf. Knetsch v. United States, 364 U.S. 361, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960). That principle applies here. Petitioners also point out that other cases have disallowed the deduction of interest when the loan transactions were set up so that the taxpayer was certain to incur economic losses. They urge that here, in contrast, the investors had a potential profit on their gold dealings. That contention ignores our prior holding that the gold dealings were only a part of the Arbitrage and Carry program, which, viewed as a whole, did not provide for the possibility of economic profit. Seykota v. Commissioner, T.C. Memo 1991-234. That contention also fails to take into account our recent opinions that the existence of an incidental profit potential will not permit the deduction of interest in transactions that are established for *600 tax avoidance purposes. See, e.g., Sheldon v. Commissioner, 94 T.C. at 767-769. Petitioners further point out that in a number of cases we have not given effect, for tax purposes, to cash-and-carry transactions when we have concluded that transactions were fictitious. Petitioners then show that here the gold trades were not fictitious; they actually took place. However, petitioners do not mention our opinion in Julien v. Commissioner, 82 T.C. at 508-509. Therein we addressed claimed interest deductions generated by a silver cash and carry program. We disallowed the interest deductions in most of the trades at issue, noting "we are not convinced that any actual purchases of spot silver or short sales of silver * * * ever took place." Julien v. Commissioner, supra at 506. In one of the series of trades involved, however, we gave the taxpayer the benefit of the doubt and assumed that the transactions at issue actually took place -- that is, that they were not factual shams. Julien v. Commissioner, supra at 502 n.8, 508 n.11. We nevertheless disallowed the interest deductions in that series *601 of trades based upon our conclusion that the deductions were generated by transactions that lacked economic substance. Julien v. Commissioner, supra at 508-509, citing Goldstein v. Commissioner, 364 F.2d at 742. That reasoning applies here. For the reasons set forth herein, respondent's motion will be granted. 2. Petitioners' Motion for Reconsideration
As noted above, at issue in these consolidated cases are tax deductions arising from the FTI/Merit programs. Before the principals of Futures Trading, Inc., created the Merit Securities markets, their clients utilized other alleged trades in options on Treasury notes. Some of these trades, petitioners assert, took place on the "Dorchester Partners" market. The validity of trading on that market is the subject of a separate proceeding in this Court. At trial, the relevance of trades on the Dorchester market to the present case was the subject of much discussion. Petitioners reported that they did not intend to litigate the Dorchester trades; and respondent's counsel agreed to keep matters relating to Dorchester trades "for another day." For its part, the Court indicated that *602 it would "not rule on the bona fides of Dorchester." The parties nevertheless placed at issue some losses reported for 1979 by the Island Investments partnership, in which petitioner Robert Henry was a member. The Court noted, correctly, that some part of those losses were apparently attributable to alleged trades on the Dorchester markets. In the absence of proof that those losses were properly deducted, we indicated, in note 32 of the original opinion, that we would sustain respondent's determination. We stated as follows: Some part of the T-Bill option losses claimed by Island for 1979 apparently resulted from trading on the Dorchester market. The same may be true of other petitioners. The validity of trading on that market is the subject of a separate proceeding in this Court. As to the specific petitioners and years before us, however, there is no evidence in the record as to the validity of the Dorchester market. Accordingly, any disallowances arising from Dorchester trading as it relates to the petitioners and years before us is sustained. [Seykota v. Commissioner, T.C. Memo 1991-234, n.32]
Petitioners now move that we reconsider our opinion *603 to the extent of eliminating the language quoted above. Respondent advises us that, on the basis of his counsel's representations at trial about Dorchester, he would not object to our elimination of the sentence sustaining the deficiencies arising from the Dorchester trades. The parties, in the motion and in the response, have made it clear that they did not intend to litigate any issues involving Dorchester. The purpose of the trial in the present case was only to consider the FTI/Merit issues. We do not wish to interfere with the other proceeding in which the Dorchester trades are at issue. Nor do we wish to obstruct the parties' agreements as to other issues before the Court which were not the subject matter of this litigation. We now agree that the last sentence of note 32 of the original opinion may interfere with the litigation of Dorchester issues. We will therefore grant petitioners' motion to the extent of omitting the last sentence in note 32 of the Memorandum Findings of Fact and Opinion filed in this case on May 28, 1991. To reflect the foregoing, Appropriate orders will be issued. Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert B. Henry and Jane Henry, docket No. 47868-86; Bruce L. Calhoun and Jacqueline R. Calhoun, docket No. 6720-87; and Martin S. Tepper and Lauri E. Tepper, docket No. 31972-87.↩
2. Mr. Seigel is no longer counsel for petitioners in docket No. 6720-87.↩