DONALD A. OSTROWER AND ROBERTA S. OSTROWER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOSEPH L. MARINO AND ALMA MARINO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ostrower v. Commissioner
Docket Nos. 8952-79, 13196-79, 10139-80, 11882-80.
United States Tax Court
T.C. Memo 1984-496; 1984 Tax Ct. Memo LEXIS 178; 48 T.C.M. (CCH) 1144; T.C.M. (RIA) 84496; September 17, 1984. *178 Respondent disallowed petitioners' claimed deductions in 1975 and 1976 for interest and short-term capital losses allegedly incurred in connection with their purchases of silver. Held, the transactions in question were shams, designed solely for the purpose of achieving interest deductions, short-term capital losses, and the conversion of ordinary income into capital gains. Therefore, petitioners' interest deductions and short-term capital losses are disallowed. Donald A. Ostrower, pro se. David H. Singer, for the petitioners in docket Nos. 13196-79 and 10139-80. Kendall C. Jones, for the respondent. STERRETT
STERRETT, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket
No.
Petitioner
Year
Deficiency
8952-79
Donald A. Ostrower and
Roberta S. Ostrower
1975
$ 10,423.00
13196-79
Joseph L. Marino and
Alma Marino
1975
13,701.27
10139-80
Joseph L. Marino and
Alma Marino
1976
10,795.14
11882-80
Donald A. Ostrower and
Roberta S. Ostrower
1976
[1] 5,252.00
After concessions, *179 the issues for decision are: (1) whether petitioners' claimed interest expenses and short-term capital losses allegedly incurred in connection with the financed purchases of silver should be disallowed because petitioners have failed to establish that the transactions occurred as claimed; (2) whether petitioners' claimed interest expenses and short-term capital losses allegedly incurred in connection with the financed purchases of silver should be disallowed because the transactions lacked economic substance; (3) alternatively, whether the claimed short-term capital losses should be disallowed due to the lack of profit motive; or (4) alternatively, whether reported long-term capital gains allegedly realized in connection with the financed purchases of silver properly should be characterized as short-term capital gains. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first stipulations of facts, second stipulations of facts, and exhibits attached thereto are incorporated herein by this reference. Petitioners Donald A. Ostrower (Ostrower) and Roberta S. Ostrower were residents of Roslyn, New York at the time of filing their petitions in this case. They *180 filed joint Federal income tax returns for the years 1975 and 1976 with the Internal Revenue Service Center in Holtsville, New York. Petitioner Roberta S. Ostrower did not personally participate in the planning or implementing of any of the transactions in issue and is a party to this action solely by virtue of having filed joint returns with her husband for the years in question. Petitioners Joseph L. Marino (Marino) and Alma Marino were residents of Garden City, New York at the time of filing their petitions in this case. They filed joint Federal income tax returns for the years 1975 and 1976 with the Internal Revenue Service Center in Holtsville, New York. Alma Marino did not personally participate in the planning or implementing of any of the transactions in issue and is a party to this action solely by virtue of having filed joint returns with her husband for the years in question. All of the transactions in question concerning petitioners were silver cash and carry transactions conducted with Mocatta & Goldsmid, Ltd. (Mocatta), a London brokerage firm.The Mocatta "Financed Silver Hedge Program," as purchased by Ostrower and Marino, involved a preplanned series of silver transactions *181 designed to defer ordinary income and convert it into capital gains. The phrase "Financed Silver Hedge Program" used by Mocatta equated with a silver cash and carry transaction. Basically, a cash and carry silver transaction involves the financed purchase of silver bullion or spot silver along with a corresponding acquisition of a commodity futures contract for the sale at some future delivery date of a like amount of silver. As a general rule, the sales price of the silver which is sold short in these transactions will exceed the purchase price of the spot silver by an amount known as the "spread," which roughly will be equivalent to the interest on the purchase price. However, the interest paid is deducted against ordinary income in the year of payment, while the spot silver is held for a sufficient period to enable the purchaser to report his gain as a long-term capital gain. Thus, the customer realizes a net after-tax benefit. The Mocatta "Financed Silver Hedge Program" was marketed in New York by the law firm of Dishy, Easton & Co. Dishy, Easton first got involved in selling the Mocatta "Financed Silver Hedge Program" in the early 1970's. As an agent for Mocatta, the New York *182 law firm located and solicited customers from various accountants and attorneys. Dishy, Easton handled all of the paper work relating to the program and received commissions from Mocatta. One of the marketing tools used by Dishy, Easton was a promotional memorandum dated March 24, 1975, which described the "Financed Silver Hedge Program" as follows: March 24, 1975 FINANCED SILVER HEDGE PROGRAM OBJECTIVES: 1.Profit potential. 2. To convert ordinary income into capital gains (long or short) and defer such gains if desired. Under this program silver bullion (spot) is bought on the London market for cash with 100% non-recourse financing (silver as collateral) and concurrently a future sale contract is entered into for delivery of the same amount of silver at a specified date and price. The difference in price between the spot purchase and the future sale is approximately equivalent to the carrying costs (interest plus storage and insurance) required to carry the silver to the expiration of the hedge. Prior to the end of the current year the interest expense is paid in cash resulting in an ordinary deduction. Upon the expiration of the hedge a capital gain (long or short) is generated. *183 Orders are placed with Mocatta & Goldsmid Ltd. one of the largest English bullion brokers founded in 1684, ten years before the Bank of England and now a subsidiary of the Standard and Chartered Banking Group Limited. Purchase and financing of the bullion are in accordance with their standard terms. Terms of Purchase
Cash Payment:
10% of deduction upon placement,
balance within approximately 90
days of expiration of hedge.
Margin:
Not required as long as the
hedged position is maintained.
Storage & Insurance:
Charges are at the rate of $ 3.00
per month or any part thereof per
contract.
Commission:
Total of $ 65.00 per hedge.
Out-of-Pocket Costs:
Discounting any profit potential,
these include commissions, spread
differentials, storage & insurance
and any interest paid and not
recouped via the future sale.
At this time the total cost is
approximately 9% pre-tax and
5% after-tax.
Payments:
Payments are made to and confirmations
received from Mocatta &
Goldsmid Ltd.
Economic Potential
The hedge is a form of commodity straddle where during the life of the hedge changes in the spread between the long and short positions could result in a profit. There is, however, a maximum risk exposure should the profit potential *184 not be realized. This risk is limited to the pre-determined out-of-pocket costs. Hypothetical Illustration: One Contract 1975
May 1
BUY: 1 Contract of spot silver
10,000 oz. [at] $ 4.50
$ 45,000
SELL: 1 Contract
for delivery Feb. 15, 1976
10,000 oz. [at] $ 4.7590
47,590
PROFIT
$ 2,590
Less: Commissions
65
NET 1976 CAPITAL GAIN
$ 2,525
100% Loan on Bullion
Carrying Costs to Feb. 15, 1976
Storage & Insurance and
Interest on Loan of $ 45,000
2,777
Net Out-of-Pocket Cost
252
Cash Flow
1975
May 1
Initial Interest payment
277
Nov. 1
Balance of Required Payment
2,500
TOTAL 1975 ORDINARY DEDUCTION
$ 2,777
* * * Risk Considerations
Loan extended is without personal liability (secured by bullion only). Interest rate is level for period of hedge. All transactions are in U.S. dollars. If the spreads and interest rates do not allow for the hedge to be established as outlined, the positions are not placed and any monies paid are refunded. Since the account is at all times in a fully hedged position, and secured by a firm future sales contract, you are not assuming the ordinary risk of price fluctuations in silver. * * * Victor Dishy was an employee of Dishy, Easton during the time period relevant to these cases. In this capacity, *185 he was personally involved in the marketing of the Mocatta program. According to Victor Dishy, none of his customers ever asked to take delivery of their silver; none of his customers ever experienced losses greater than the percentage specified in the March 24, 1975 promotional memorandum; and none of his customers ever made an actual economic profit on the Mocatta "Financed Silver Hedge Program." As a rule, no financial statements were required of the customers who dealt in the Mocatta silver transactions. None of the customers opened accounts with Dishy, Easton, no discretionary accounts were established, and customers had no ability to specify transaction prices or dates. Dishy stated that the odds for making any money on the program were "a long shot," so he did not emphasize large profits in selling it. Rather, he discussed the tax advantages with potential customers as well as how the program limited the customer's risk of loss. Donald Ostrower
Ostrower is and was at all relevant times an attorney. In 1975, Ostrower was of counsel to the firm of Danziger, Shore, Markoff, Figgert and Rice in White Plains, New York. One of Ostrower's responsibilities with the Danziger *186 firm was the investigation of various tax shelters on behalf of the firm's clients. In late 1974 or early 1975, Ostrower, in his professional capacity, was called upon to investigate the Mocatta "Financed Silver Hedge Program" being promoted by Victor Dishy. In his =P0000*9 meeting with Victory Dishy, Dishy emphasized the tax benefits to be yielded by the transaction. Prior to his investigation on behalf of his law firm, Ostrower had entered into a 1974 cash and carry silver transaction with Mocatta on the advice of his accountant. Although Ostrower no longer has any documentation confirming his alleged transactions in 1974, his 1974 Federal income tax return filed with his wife, Roberta, reflected the following transactions: Date
Transaction description
(a) 8/22/74
Purchase (buy) 90,000 ounces silver,
delivery date unknown, at a total price
of $ 404,843, ("long" position).
(b) 8/22/74
Sell 90,000 ounces of silver, delivery date
unknown, at a total price of $ 419,310,
("short" position).
(c) 8/27/74
Close 8/22/74 "long" position by selling
90,000 ounces silver, delivery date unknown,
at a total price of $ 397,980.
(d) 8/27/74
Purchase (buy) 90,000 ounces "spot" silver
at a total price of $ 393,818.
(e) 12/27/74
Close 8/22/74 "short" position, by buying
90,000 ounces of silver, delivery date
unknown, at a total price of $ 429,750.
(f) 12/27/74
Sell "spot" silver purchased 8/27/74,
at a total price of $ 429,750.
As *187 a result of these alleged transactions, petitioners claimed a $ 20,298 interest deduction on their 1974 Federal income tax return for monies paid to Mocatta. Additionally, petitioners claimed a short-term capital loss of $ 6,863 as a result of the August 27, 1974 closing of the August 22, 1974 "long" position; a short-term capital loss of $ 10,440 as a result of the December 27, 1974 closing of the August 22, 1974 "short" position; a short-term capital gain of $ 35,932 as a result of the sale on December 27, 1974 to Mocatta of the spot silver purchased on August 27, 1974; and a deduction of $ 135 for silver storage costs. Thus, petitioners reported a net short-term capital gain of $ 18,629 and claimed ordinary deductions totaling $ 20,433 as a result of the 1974 silver transactions with Mocatta. Ostrower's net economic loss or net out-of-pocket cost for his 1974 cash and carry transactions was $ 1,804. However, the short-term capital gain of $ 18,629 reported by Ostrower from these transactions eliminated a reported short-term loss of $ 5,924 resulting from an unrelated sale of stock; and also reduced by $ 12,705 a reported long-term capital loss of $ 16,404 resulting from other *188 unrelated stock sales. Furthermore, petitioners claimed deductions for interest and storage costs, reducing their 1974 taxable income from $ 80,726 to $ 60,293. Ostrower admits that he did not enter into the 1974 Mocatta transactions with the expectation of any profit. Ostrower's law firm decided not to recommend the Mocatta program to its clients in 1975; however, Ostrower did ultimately pursue discussions with Dishy on a personal basis. Dishy recommended that Ostrower establish an initial long and short position and indicated that the risk to Ostrower on the entire transaction would be approximately a $ 2,500 loss. The 1975 transactions
In a form letter provided by Mocatta dated September 12, 1975, Ostrower gave authorization to Mocatta to enter into his first silver transactions. This form letter outlined several points, including that the price of the forward sale would reflect a premium over the spot silver price approximately equal to the amount that Ostrower would have to pay in interest, storage, and insurance costs; that a nonrecourse obligation would be the basis for the purchase of the spot silver and that such obligation would be confirmed in writing by Mocatta; that *189 Ostrower personally would not be liable for payment of his obligation; that the approval of Mocatta was required for any prepayment of the loan principal; and that 10 percent of the total amount of interest, storage, and insurance costs must be paid on placement of the transaction order with the remainder due by December 15, 1975. In the September 12, 1975 letter, Ostrower authorized Mocatta to purchase 80,000 ounces of silver and to sell a corresponding amount of silver for March 28, 1976 delivery "to be held for my account for immediate delivery at your vault or offices in London." Ostrower did not specify any of the silver transaction dates or prices, nor did he specify the spreads or differentials to be used. The letter did not authorize the establishing of a straddle position on September 15, 1975. Ostrower sent the Septeber 12, 1975 letter back to Dishy, Easton, which in their normal course of business would have forwarded the letter to London by mail or courier. Ostrower allegedly entered into his first silver transactions with Mocatta on September 15, 1975. On that date, Ostrower's transaction documents (Contract No. 104375) reflect a purchase of 80,000 ounces of silver *190 from Mocatta for delivery on October 20, 1975 at a total cost of $ 370,040, or $ 4.6255 per ounce. This purchase of silver for future delivery clearly was not authorized in the form letter from Ostrower to Mocatta dated September 12, 1975. Additionally, Ostrower's transaction documents (Contract No. 104450) from Mocatta also confirm a sale on September 15, 1975 of 80,000 ounces of silver to Mocatta for delivery on March 28, 1976 at a total price of $ 385,240, or $ 4.8155 per ounce. Subsequently, on September 17, 1975, Ostrower's transaction documents (Contract No. 104229) reflect a sale to Mocatta of the 80,000 ounces of silver for October 20, 1975 delivery that was purchased 2 days earlier for a total price of $ 362,560, or $ 4.5320 per ounce. Thus, Ostrower's transaction documents reflect a paper loss of $ 7,480 from the unauthorized purchase and sale of the 80,000 ounces of silver for delivery on October 20, 1975. Additionally, Ostrower also received transaction documents (Contract No. 104309) which confirm the purchase as authorized in the September 12, 1975 letter of 80,000 ounces of spot silver from Mocatta on September 17, 1975 at a total cost of $ 359,200, or $ 4.49 per ounce. *191 In connection with this alleged purchase of 80,000 ounces of spot silver on September 17, 1975, Ostrower received a letter from Mocatta dated September 15, 1975 in which Mocatta confirmed having sold 80,000 ounces of unallotted silver to Ostrower at a price of $ 4.49 per ounce. Strangely, the September 15, 1975 letter made no mention of the purported initial straddle position which was established for Ostrower on that date. The September 15, 1975 letter also confirmed that Mocatta was advancing Ostrower the entire purchase price for the 80,000 ounces of silver or $ 359,200 on a nonrecourse basis with interest at 10.25 percent per year from September 17, 1975 through March 28, 1976. The interest rate on the alleged loan was set by Mocatta and was not negotiated by Ostrower. The September 15, 1975 letter also provided that 10 percent of the total interest, storage and insurance charges was due upon placement with the balance due by December 15, 1975. However, despite the fact that the terms of the letter required an immediate 10-percent payment, Ostrower's first check to Mocatta for $ 2,000 was not written until 23 days later on October 7, 1975. The $ 2,000 check was made payable *192 to Dishy, Easton, rather than Mocatta as required by the written agreement. Ostrower was charged commissions of $ 32.50 per contract, or a total of $ 260, in a September 15, 1975 document entitled "Advice of Debit" in connection with the establishment of his "long" position on that date. Additionally, Ostrower was also charged an identical amount for commissions pertaining to his purchase of 80,000 ounces of spot silver in an "Advice of Debit" document dated September 17, 1975. Sometime between October 7, 1975 and December 15, 1975, Ostrower received an undated form letter from Dishy, Easton captioned "Notice of Interest Payment Due." This letter called for payment of $ 17,920 by December 15, 1975. The $ 17,920 amount represented the balance of the interest, insurance, and storage charges due to Mocatta. In accordance with the terms of his agreement, Ostrower executed a personal check dated December 15, 1975, payable to Mocatta in the amount of $ 17,920. Subsequently, in a document captioned "Advice of Credit," dated December 31, 1975, Mocatta credited Ostrower's account for $ 19,920. On their Federal income tax return for 1975, petitioners reported an interest deduction of $ 19,920 *193 attributable to their payment of interest to Mocatta. Additionally, they also reported a short-term capital loss of $ 7,740 as a result of the September 17, 1975 closing of the "long" position purportedly established on September 15, 1975. The net effect of the Mocatta silver transactions on petitioners' return was to reduce their taxable income from $ 80,926 to $ 61,006. [2] In his notice of deficiency for 1975, respondent disallowed petitioners' claimed deductions for capital losses and interest expenses on the grounds that petitioners had not established the existence of such losses or that the interest was deductible under section 163. The 1976 Transactions
Ostrower's transaction documents dated March 28, 1976 (Contract No. 106161) confirm a sale of the 80,000 ounces of spot silver allegedly purchased from Mocatta on September 17, 1975. The purported sale was made back to Mocatta for a total price of $ 385,240, or $ 4.8155 per ounce. Thus, Ostrower's transaction documents reflect *194 a paper profit of $ 26,040 from the sale of the 80,000 ounces of spot silver allegedly purchased on September 17, 1975. However, concurrent with this sale, Ostrower's transaction documents (Contract No. 106162) also reflect a purchase of 80,000 ounces of spot silver from Mocatta for a total cost of $ 385,240, or $ 4.8155 per ounce. This silver was used to close Ostrower's "short" position allegedly established on September 15, 1975. Ostrower never personally communicated with anyone at Mocatta during the time period relevant to his transactions. Although Ostrower was already allegedly in debt to Mocatta for $ 359,200, his loss of $ 7,480 on the September 15, 1975 "long" position was carried by Mocatta without interest from September 17, 1975 until March 10, 1976. At that time the parties have stipulated that the $ 7,480 loss was deducted against the gains from the sale of the 80,000 ounces of spot silver. However, the spot silver was not sold, according to Ostrower's transaction documents, until March 28, 1976. On April 13, 1976, Ostrower deposited to his own personal account $ 18,053.44 received from Mocatta sometime subsequent to March 28, 1976. Ostrower's actual economic loss *195 or out-of-pocket cost from the 1975 through 1976 Mocatta silver transactions (aside from tax benefits) was $ 1,866.56, computed as follows: Actual interest charged
(per 3/28/76 "Advice of Credit")
$ 19,738.56
Commission on 9/17/75 "spot" purchase
260.00
Loss on 9/15/75 "long" position
7,480.00
Commission on 9/15/75 "long" position
260.00
Insurance and storage charges
168.00
TOTAL COST
$ 27,906.56
Gain (profit) on 3/28/76 sale of "spot"
26,040.00
TOTAL GAIN
26,040.00
NET LOSS
$ 1,866.56
(transaction cost) The net loss was equivalent to $ .023332 per ounce. Ostrower's out-of-pocket cost thus equaled 9.37028 percent of petitioners' claimed interest deduction for 1975. On their Federal income tax return for 1976, petitioners reported a long-term capital gain of $ 25,780 attributable to their purported sale of 80,000 ounces of spot silver on March 28,1976. [3] Petitioners also claimed a short-term capital loss of $ 6,740 attributable to their unused silver loss from 1975. In his notice of deficiency, respondent disallowed the short-term capital loss on the grounds that petitioners had failed to establish the existence of such loss. Additionally, respondent recharacterized the $ 25,780 long-term gain reported *196 by petitioners from the silver transactions as short-term capital gains pursuant to section 1233. Joseph Marino
In 1975, Marino was a practicing lawyer who also conducted a New York State bar review course. He first learned of the Mocatta silver cash and carry transactions from the printer of his bar review materials, who referred Marino to Dishy, Easton. Subsequently, Marino and his accountant, Joseph Ruggiero, met at Dishy, Easton's offices where they were provided with Dishy, Easton's March 24, 1975 promotional document with respect to the Mocatta financed silver hedge program. Marino's silver transactions conducted with Mocatta were amazingly similar to those of Ostrower detailed previously. In point of fact, with the exception of the amounts of silver allegedly purchased and sold, the transactions were identical. Each of Marino's transactions was reflected on a separate contract with Mocatta with all prices displayed in dollars. Marino had no input into the *197 transactions whatsoever and did not even follow the silver market. Furthermore, Marino kept no records of the transactions himself but instead forwarded all documents to his accountant, Joseph Ruggiero. The 1975 Transactions
In a form letter provided by Mocatta dated September 12, 1975, Marino gave authorization to Mocatta to enter into, on his behalf, a silver cash and carry transaction. This form letter, as did the one signed by Ostrower, provided that the price of the forward sale would reflect a premium over the spot silver price approximately equal to the amount that Marino would have to pay in interest, storage, and insurance costs; that a nonrecourse obligation would be the basis for the purchase of the spot silver and that such obligation would be confirmed in writing by Mocatta; that Marino personally would not be liable for payment of his obligation; that the approval of Mocatta was required for any prepayment of the loan principal; and that 10 percent of the total amount of interest, storage, and insurance costs must be paid on placement of the transaction order with the remainder due by December 15, 1975. In the September 12, 1975 letter, Marino authorized Mocatta to *198 purchase 100,000 ounces of silver for Marino's account, and to sell a corresponding amount of silver for March 28, 1976 delivery. [4] The letter did not authorize the establishment of a straddle position; nevertheless, Marino's transaction documents (Contract No. 104409) reflect that on September 15, 1975 Marino purchased 100,000 ounces of silver from Mocatta for delivery on October 20, 1975 at a total cost of $ 462,550, or $ 4.6255 per ounce. Additionally, Marino's transaction documents (Contract No. 104484) also confirm a sale on September 15, 1975 of 100,000 ounces of silver to Mocatta for delivery on March 28, 1976 at a total price of $ 481,550, or $ 4.8155 per ounce. Thus, as was the case with Ostrower, instead of entering into the transactions authorized by Marino's September 12, 1975 letter, Marino's transaction documents reflect an initial straddle position consisting of a "long" and "short" position. However, as was again the case with Ostrower, this initial straddle position lasted only 2 days. On September 17, 1975, Marino's transaction documents (Contract No. 104263) reflect a sale back *199 to Mocatta of the 100,000 ounces of silver for October 20, 1975 delivery which was purchased on September 15, 1975 for a total price of $ 453,200, or $ 4.5320 per ounce. Thus, according to Marino's transaction documents, there was an unauthorized purchase and sale of silver for October 20, 1975 delivery from which Marino lost $ 9,350. Additionally, Marino also received transaction documents (Contract No. 104343) which confirm the purchase, as authorized in the September 12, 1975 letter, of 100,000 ounces of spot =P0000*20 silver from Mocatta on September 17, 1975 at a total cost of $ 449,000, or $ 4.49 per ounce. In connection with this alleged purchase of spot silver, Marino received a letter from Mocatta dated September 15, 1975, in which Mocatta confirmed having sold 100,000 ounces of unallotted silver to Marino at a price of $ 4.49 per ounce. The September 15, 1975 letter also confirmed that Mocatta was advancing Marino the entire purchase price for the 100,000 ounces of spot silver totaling $ 449,000. This loan was made on a nonrecourse basis with interest at 10.25 percent from September 17, 1975 through March 28, 1976. The terms of this alleged loan were identical to that *200 of Ostrower's with 10 percent of the total interest, storage, and insurance charges being due on placement and the balance due by December 15, 1975. However, even though the terms of the letter required an immediate 10 percent payment, Marino's check to Mocatta in the amount of $ 2,500 was not written until September 25, 1975. In connection with the establishment of his initial "long" position, Marino was charged commissions of $ 32.50 per contract for a total of $ 325 in a September 15, 1975 document entitled "Advice of Debit." Additionally, Marino was also charged an identical amount for commissions pertaining to his purchase of 100,000 ounces of spot silver in an "Advice of Debit" dated September 17, 1975. Sometime between October 7, 1975 and December 15, 1975 Marino received from Dishy, Easton an undated form letter captioned "Important Reminder" that called for payment of interest by December 15, 1975. Additionally, Marino also received during the same time period an undated form letter from Dishy, Easton captioned "Notice of Interest Payment Due" that called for payment of $ 22,400 by December 15, 1975. In accordance with the terms of his agreement, Marino executed a personal *201 check dated December 15, 1975 payable to Mocatta in the amount of $ 12,400. Additionally, Marino executed a draft dated December 15, 1975 and payable to Mocatta on the "Oppenheimer Monetary Bridge, Inc." in payment of the remaining $ 10,000 of interest due. On petitioners' Federal income tax return for 1975 they claimed an interest deduction in the amount of $ 24,900 attributable to the payment of interest to Mocatta. However, petitioners did not report the short-term capital loss of $ 9,675 resulting from the September 17, 1975 closing of their September 15, 1975 "long" position on their originally filed return for 1975. [5] Thus, the net effect of the Mocatta silver transactions on petitioners' 1975 return was to reduce their taxable income by $ 24,900. In his notice of deficiency for 1975, respondent disallowed petitioners' claimed interest deduction of $ 24,900 for amounts paid to Mocatta on the grounds that petitioners had not established that such payments were deductible under section 163. The 1976 Transactions
Marino's transaction documents dated March 28, 1976 *202 (Contract No. 106391) confirm a sale of the 100,000 ounces of spot silver allegedly purchased from Mocatta on September 17, 1975. The purported sale was made back to Mocatta for a total price of $ 481,550, or $ 4.8155 per ounce. Thus, Marino's transaction documents reflect a paper profit of $ 32,550 from the sale of the 100,000 ounces of spot silver purchased on September 17, 1975. Additionally, Marino's transaction documents (Contract No. 106392) also reflect a purchase of 100,000 ounces of spot silver from Mocatta on March 28, 1976 at the same price of $ 4.8155 per ounce. This silver was allegedly used to close Marino's short position established on September 15, 1975. In April 1976, Marino received a $ 22,566.80 check from Mocatta. The amount paid by Mocatta is broken down as follows: Gain
$ 32,550.00 Interest income [6]
226.80 Less: Commission on "spot" sale
(325.00)
Commission on "long" position
(325.00)
Loss on closed "long" position
(9,350.00)
Insurance and storage
(210.00)
Net Payment from Mocatta
$ 22,566.80 Taking this payment into account, Marino's net economic *203 loss or out-of-pocket cost (aside from tax benefits) from the 1975 through 1976 Mocatta silver transactions was $ 2,333.20, which is computed as follows: Actual interest charged (per 3/28/76
"Advice of Credit")
$ 24,673.20
Commission on 9/17/75 "spot" purchase
325.00
Loss on 9/15/75 "long" position [7]
9,350.00
Commission on 9/15/75 "long" position
325.00
Insurance and storage charges
210.00
TOTAL COST
$ 34,883.20
Gain (profit on 3/28/76 sale of "spot")
32,550.00
TOTAL GAIN
$ 32,550.00
NET LOSS
$ 2,333.20
(transaction cost)
Again, as was the case with Ostrower, Marino's out-of-pocket cost equaled 9.37028 percent of petitioners' claimed interest deduction for 1975. On their Federal income tax return for 1976, petitioners reported a long-term capital gain of $ 32,225 attributable to their purported sale of 100,000 ounces of spot silver on March 28, 1976. [8] Additionally, although petitioners failed to claim a loss on their 1975 return attributable to the September 17, 1975 transaction *204 closing the "long" position established on September 15, 1975, petitioners claimed a short-term capital loss carryover from such transaction of $ 9,673.61 on their 1976 return. In his notice of deficiency respondent disallowed the short-term capital loss carryover on the grounds that petitioners had failed to establish the existence of such loss. In addition, respondent reclassified the $ 32,225 long-term capital gain reported by petitioners from the Mocatta transactions as short-term capital gains pursuant to section 1233. OPINION The questions presented for our decision are whether certain interest expenses and short-term capital losses allegedly incurred by petitioners in connection with their financed purchases of silver are allowable and whether certain amounts reported by petitioners as long-term capital gains should be reclassified as short-term capital gains. Petitioners contend that the transactions in question were bona fide and had economic substance. They assert that the transactions were entered into for profit and not solely to obtain an interest deduction and, *205 therefore, that both the interest expense deductions and capital losses claimed on their returns are properly allowable. They also argue that there is no basis in the statute or case law for reclassifying their long-term capital gains as short-term capital gains for tax purposes. Furthermore, in the alternative, petitioners urge that if their 1975 deductions are disallowed, then their 1976 capital gains should also be disregarded. Respondent, on the other hand, insists that the interest deductions and capital losses should be disallowed because petitioners have not substantiated that their alleged financed silver cash and carry transactions occurred as claimed. Furthermore, respondent contends that the transactions lacked economic substance and that there were no bona fide interest payments. Alternatively, respondent also asserts that the long-term capital gains recognized by petitioners in 1976 should be reclassified as short-term capital gains based on his theory that, for purposes of section 1233, spot silver is property substantially identical to a short-sale contract. In the instant case, Ostrower and Marino entered into transactions which were identical except for quantity. *206 The transactions in question, which were marketed by the London firm of Mocatta & Goldsmid, were a variation of the so-called financed silver cash and carry transaction. [9] A simple cash and carry transaction involves the purchase of spot silver along with a corresponding short sale of silver so that basically the customer is agreeing to deliver the same amount of silver he simultaneously purchases at a specified point in the future for a specified price. In order to pay for the initial purchase of silver, the customer borrows the entire purchase price and deducts the interest in the year of the purchase. However, because the sales price of the short silver generally exceeds the purchase price of the spot silver by an amount roughly equivalent to the interest charge, there is no commensurate outlay of cash. Furthermore, when the taxpayer eventually sells the spot silver, the gain on such sale normally will qualify for long-term capital gain treatment. In the case at hand, instead of initially purchasing spot silver along with selling an identical quantity for future delivery, petitioners allegedly entered into an initial straddle *207 position, in which a "long" and "short" position were simultaneously established. However, this initial straddle position was subsequently broken in only 2 days by closing the "long" position at a loss and immediately replacing it with spot silver. Thus, by adding this first step, petitioners hoped to achieve not only an up-front interest deduction but also a capital loss. The tax treatment of the so-called "cash and carry tax shelter" was addressed by Congress in section 263(g), which was added to the Code as part of the Economic Recovery Tax Act of 1981. Under section 263(g), the carrying charges of such transactions, including interest expense, are required to be capitalized. However, section 263(g) is only applicable to cash and carry straddles entered into after June 23, 1981. Therefore, since the tax years involved in the present case are 1975 and 1976, we must decide this case under the law as it existed prior to section 263(g). With respect to the claimed interest deductions, section 163 provides, with exceptions and limitations relevant herein, that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." For purposes *208 of section 163, the term "interest" denotes that which is paid for the use of borrowed funds or compensation for the use or forbearance of money. Old Colony R. Co. v. Commissioner,284 U.S. 552, 560 (1932); Deputy v. Dupont,308 U.S. 488, 498 (1940). The "indebtedness" upon which such a payment is made must be an "existing, unconditional, and legally enforceable [sic] obligation." Kovtun v. Commissioner,54 T.C. 331, 338 (1970), aff'd. per curiam 448 F.2d 1268 (9th Cir. 1971); Titcher v. Commissioner,57 T.C. 315, 322 (1971).In determining whether a payment constitutes interest on indebtedness, economic realities govern over the form in which a transaction is cast. Knetsch v. United States,364 U.S. 361, 366 (1960); Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966). Respondent, in the present case, argues that petitioners have not substantiated that their purported silver transactions occurred as claimed and that such transactions were mere shams without economic substance. We note at the outset that we have previously recognized that amounts denominated as interest cannot be deducted where the underlying transaction was a sham. Derr v. Commissioner,77 T.C. 708, 730 (1981). *209 Furthermore, "Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction." Goldstein v. Commissioner, supra at 742. Similarly, with respect to the claimed short-term capital losses, section 165(a) requires that in order to be deductible a loss must be "sustained during the taxable year." The regulations under section 165(a) provide that "To be allowable as a deduction * * *, a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." Sec. 1.165-1(b), Incom Tax Regs. See Gregory v. Helvering,293 U.S. 465 (1935). Petitioners bear the burden of proving that the transactions actually occurred as claimed. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In the instant case, there are a number of irregularities and unexplained inconsistencies in petitioners' alleged silver transactions which lead us to the inescapable conclusion *210 that the entire transactions were a complete sham orchestrated solely for the purpose of achieving the desired tax results. Basically, Ostrower and Marino are relying on their own uncorroborated foreign documents to substantiate their claimed interest deductions and capital losses arising in conjunction with their alleged silver transactions. We find it highly relevant that no one from the London broker, Mocatta & Goldsmid, testified at trial and that there is no evidence in the record, other than petitioners' own self-serving testimony, to verify their transactions. In light of the numerous questions that are raised by the inconsistencies and irregularities in petitioners' documentary evidence, the burden was clearly on petitioners to supply some independent verification and explanation of their claimed transactions. For instance, although petitioners claim to have purchased actual silver, the Mocatta documents offered by petitioners indicate they had at best only unliquidated claims against Mocatta for the silver. In addition, the documents themselves are internally inconsistent. For example, in the September 12, 1975 form letters executed by petitioners, both Ostrower and Marino *211 authorized only the purchase of spot silver and the sale of silver for March 28, 1976 delivery. However, despite the specific terms of their agreement with Mocatta, both petitioners' transaction documents reflect the establishment of a "long" position on September 15, 1975 via the purchase of silver for October 20, 1975 delivery. Two days later on September 17, 1975, petitioners' unauthorized "long" positions were closed with petitioners realizing substantial losses. Yet strangely, neither petitioner seemed concerned about such losses. In light of the fact that the transactions in question were between Mocatta and petitioners as principals and not executed pursuant to an organized exchange, one would have expected petitioners to be angrily suing Mocatta for executing unauthorized transactions if the transactions had been truly bona fide. After all, were it not for the unauthorized purchases and sales of the silver for October 20, 1975 delivery, both petitioners would have had locked-in profits even after carrying costs. Their lack of concern over these unauthorized losses can only be attributed to the fact that they merely bought a package of documents; they knew what they had *212 bought; they were not really speculating; and they were unconcerned about profits. Another example of the lack of substance in the alleged transactions is illustrated by the fact that petitioners' transaction documents dated September 17, 1975 reflect their purchases from Mocatta of the spot silver authorized in their September 12, 1975 letter. However, the financing, the price of the silver, and indeed confirmation of the purchases themselves can be found in letters from Mocatta dated September 15, 1975. The fact that the terms of petitioners' purchases of spot silver were settled as of September 15, 1975 destroys any air of legitimacy surrounding petitioners' initial straddle positions established on September 17, 1975. Similarly, another inconsistency in petitioners' evidence concerns the numbering of the Mocatta transaction documents offered by petitioners. As is the case with the September 15, 1975 letters which detail the terms of transactions purportedly not entered into until 2 days later, petitioners' contract numbers reveal an ordering that is inconsistent with the alleged transaction dates. For example, the contract numbers of the straddle position allegedly established *213 by Ostrower on September 15, 1975 were 104375 and 104450; yet the contract numbers for the September 17, 1975 purchase of spot silver and closing of the "long" position were 104229 and 104309. Similarly, Marino's initial straddle position purportedly entered into on September 15, 1975 was evidenced by transaction documents with contract numbers of 104409 and 104484; however, the September 17, 1975 purchase of spot silver and closing of the "long" position were evidenced by contract numbers of 104343 and 104263. Thus, in both instances, the transaction documents of the claimed September 17, 1975 transactions are marked with contract numbers that actually precede the numbers for the supposedly previous contracts on September 15, 1975. The obvious implication of these inconsistencies is that all of the documents were numbered after the fact. The inference that all of the documents evidencing petitioners' initial transactions were backdated is also buttressed by the timing of petitioners' initial 10-percent payments to Mocatta. Although according to the terms of their agreements such payments were due upon placement, neither Ostrower's nor Marino's evidence of payment comports with *214 this agreement. In the case of Marino, his check for $ 2,500 was not written until September 25, 1975, while Ostrower's check for $ 2,000 was not written until October 7, 1975. [10]
Another extraordinary aspect of petitioners' transactions is that both petitioners' transactions are, except for the amounts of silver allegedly purchased and sold, identical. In point of fact, both petitioners' out-of-pocket costs equaled 9.37028 percent of their claimed interest deductions for 1975. The fact that neither petitioner had any input into the transaction dates and prices and that each entered into an identical series of trades leads one to the inevitable conclusion that the transactions were mere paper trades designed to achieve certain tax benefits. This conclusion is certainly buttressed by Victor Dishy's testimony that none of his clients ever made money, that all trades were fixed, and that no client ever lost more than the percentages outlined in their promotional documents. One especially glaring factor in this respect is the fact that the purchase and sales prices of spot silver in petitioners' transactions on March *215 28, 1976 were $ 4.8155 per ounce--an amount exactly equal to the prices at which petitioners sold on September 15, 1975 silver short for delivery on the March date. When one considers the fact that a legitimate futures contract does not reflect the price of spot silver on any given date but contains a premium for carrying costs and speculative factors, the likelihood that a price at which petitioners entered into a short position on September 15, 1975 would be identical to the value of spot silver on a date over 6 months in the future is practically nonexistent. However, even in light of all of the discussed inconsistencies and unlikelihoods of the verity of the facts presented by petitioners, probably the most telling factor contra to petitioners' positions is the relationship between petitioners and Mocatta as borrowers and lender. Although Mocatta supposedly advanced both petitioners huge sums of money, in neither case and in no similar cases did Mocatta ever ask for financial statements from its silver customers. Furthermore, despite the huge sums of money owed by petitioners to Mocatta, Mocatta carried petitioners' losses in both cases for approximately a 6-month period. Indeed, *216 no evidence exists to show that Mocatta ever paid itself any money pursuant to the purported loans or even what type of bookkeeping entries, if any, were made. The loans were purportedly secured by silver which Mocatta itself was selling to petitioners and which, in all cases of which we are aware, was subsequently sold back to Mocatta when the loans became due. In point of fact, all we really know is that petitioners sent Mocatta money in late 1975 and got back in 1976 all but 9.37028 percent of that. When, as in this case, a party sells an asset to another party, dictates the price and terms of the sale, finances the sale, dictates the interest rate for the purported loan, retains the actual asset, and finally repurchases the asset to satisfy the loan, then any semblance of genuine indebtedness is merely illusory. After a thorough review of the facts and in light of the facts discussed, we find that the entire transactions before us in this case were nothing more than a sham designed and inspired for the sole purpose of achieving interest deductions, short-term capital losses, and the conversion of ordinary income into capital gains. Petitioners have failed to prove that there *217 was any actual silver, that there was any genuine indebtedness, or that there was any purpose, other than the avoidance of taxes, for any of the transactions in question. We therefore find that petitioners' interest deductions and short-term capital losses are disallowed. Since we have determined that no interest deductions or capital losses are allowable to petitioners, we need not decide the short-term versus long-term capital gains issue raised in the alternative by respondent.[11]
Accordingly, Decisions will be entered under Rule 155. Footnotes
1. The notices of deficiency were dated Mar. 28, 1979 in docket No. 8952-79, June 20, 1979 in docket No. 13196-79, and Apr. 11, 1980 in docket Nos. 10139-80 and 11882-80.↩
2. Ostrower received no benefit from his claimed short-term capital loss of $ 7,740 in 1975 because his net capital losses already exceeded the $ 1,000 limit then in effect under sec. 1211, I.R.C. 1954↩.
3. However, petitioners failed to report $ 181.44 of interest income credited to their account by Mocatta on Mar. 28, 1976. This interest was a credit for an overpayment of interest due under the Sept. 12, 1975 agreement.↩
4. A typographical error in the agreement indicated 10,000 rather than 100,000 ounces.↩
5. The $ 9,675 amount is arrived at by adding the $ 325 of commissions Marino was charged to the $ 9,350 paper loss.↩
6. As was the case with Ostrower, Marino also was credited for an overpayment of interest due under the Sept. 12, 1975 agreement.↩
7. Marino's loss of $ 9,350 on the Sept. 15, 1975 "long" position was carried by Mocatta from Sept. 17, 1975 until Mar. 28, 1976, when it was deducted or offset against the gains from the sale of the 100,000 ounces of spot silver.↩
8. However, petitioners did not report the $ 226.80 of interest credited to their account on Mar. 28, 1976.↩
9. See Julien v. Commissioner,82 T.C. 492↩ (1984).
10. Additionally, Ostrower's check was never made payable to Mocatta.↩
11. Implicit in our opinion is the holding that the capital gains should be disregarded since the transactions themselves were shams. Indeed, respondent concedes as much on brief.↩