GEORGE T. and ELIZABETH A. HIRAI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hirai v. Commissioner
Docket No. 1873-80.
United States Tax Court
T.C. Memo 1984-495; 1984 Tax Ct. Memo LEXIS 177; 48 T.C.M. (CCH) 1134; T.C.M. (RIA) 84495; September 17, 1984. *177 Respondent disallowed petitioners' claimed deduction in 1973 and 1974 of alleged prepaid interest expense incurred in financing purchases of spot silver (a so-called cash and carry tax shelter) on grounds that the transaction lacked economic substance, was prompted solely by petitioner's desire to achieve an interest deduction, and that no interest was actually paid. The loans were nonrecourse with repayment due on date corresponding to delivery date of short-sale position established in connection with petitioner's initial purchase of spot silver. Interest was due immediately. Petitioner lost money on each transaction. Held, deduction disallowed because transaction entered into solely to get an interest deduction and petitioners failed to prove that interest payments were actually paid. Petitioners presented no evidence that interest was actually paid in 1973 or 1974. George T. and Elizabeth A. Hirai, pro se. Kendall C. Jones for the respondent. STERRETT
STERRETT, Judge: By notice of deficiency dated November 7, 1979, respondent determined dificiencies in petitioners' Federal income taxes for the taxable years 1973 and 1974 in the amounts of $1,257.80 and $7,087.50, respectively. *178 After concessions, the sole remaining issue for decision is the decuctibility of petitioners' claimed interest expenses incurred in connection with several alleged purchases of silver. [1] FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, George T. and Elizabeth A. Hirai, were residents of Upper *179 Montclair, New Jersey, at the time of filing their petition in this case. They filed joint Federal income tax returns for the years 1973 and 1974 with the Internal Revenue Service Center in Holtsville, New York. Elizabeth A. Hirai is a party to this action solely by virtue of having filed joint returns with her husband for the taxable years in question (hereinafter all references to petitioner in the singular will be to George T. Hirai). Petitioner is and was at all relevant times a commodity analyst. He considers himself to be a recognized expert in the area of commodity trading. Petitioners used the cash receipts and disbursements method of accounting for the taxable years in question. All of the transactions in question concerning petitioners were conducted with Rudolf Wolff & Co., Ltd. (Rudolf Wolff), a London brokerage firm. Petitioner first learned of the Rudolf Wolff cash and carry silver transactions from Marshall Persky, an account executive with a Chicago brokerage firm, ACLI. Persky told petitioner that the Rudolf Wolff silver cash and carry transactions offered investors a tax shelter with limited risk. Basically, the silver cash and carry transactions marketed by *180 Rudolf Wolff involved a purchase of silver along with a corresponding short sale of silver. Thus, under this arrangement, the customer, at the same time he purchases the silver, agrees to deliver the same amount of silver at a specified point in the future for a specified price. In order to pay for the initial purchase of silver, the customer borrows the entire purchase price and deducts the interest paid in the year of the purchase. However, because the sales price of the short silver generally exceeds the purchase price of the spot silver by an amount roughly equivalent to the interest charge, there is no commensurate outlay of cash. Furthermore, when the taxpayer eventually sells the spot silver, the gain on such sale will normally qualify for long-term capital gain treatment. Rudolf Wolff marketed the silver cash and carry transactions as a means of converting ordinary income into capital gains. The silver cash and carry transactions were described in a Rudolf Wolff document in circulation during the years 1973 through 1975 as follows: EXAMPLE OF HOW ORDINARY INCOME CAN BE CONVERTED TO CAPITAL GAINS BY THE HOLDING OF SILVER FOR A PERIOD. In this example the client wishes to *181 convert approximately $100,000 of ordinary income to capital gains. On 4th June he buys 30 lots of 10,000 ozs each for delivery 11th June at 195.88p per oz, and at the same time sells 30 lots for delivery 13th December at 210.00p per oz. On 11th June he has to take up the silver he has purchased. The invoice amount of the purchase is [British pounds] 587,400. This amount is provided for the client by a finance house in London, and he is charged interest on the amount for the period of the loan, ie. until the redelivery of the silver. In this example interest at 14% for 185 days amounts to $41,681.26 (which [at] $2.40 equals $100,035.02). The storage and insurance for the period comes to [British pounds] 225, and the net sales price comes to [British pounds] 629,606.25. Deducting the cost plus the rent and insurance from the net sales, one is left with a gain of [British pounds] 41,981.25, which after deduction of the interest leaves a profit of [British pounds] 299.99, which is equal to $719.98. In arriving at this answer, we have charged merely a nominal commission of 1/16% and have borrowed money from the finance house at rather cheaper rates than existing market rates, and *182 in this way we have been able to show a profit. There are, of course, further charges to be made which include additional commission and further bank fees. In this example these amount of $5,720.00. Therefore interest charged equals $100,035.00, net gain $100,755.00 less $5,720.00 equals $95,035.00, which gives a dollar cost of $5,000.00, equal to 4.998%. From this you will see that the operation will cost approximately [illegible] ie. with an interest charge of $100,000 you will receive a net gain of $95,000 at the completion of the operation. The following promotional document which details the desired tax results of these transactions was also used as part of a sales package during the tax years at issue: [See Illustration in Original] This promotional document does not refer to any profit potential but rather emphasizes the fact that a tax deduction of $20,000 was sought. The document represents that financing will be handled by the firm of I. Rochester, Ltd. After making numerous inquiries into the reputation of Rudolf Wolff, petitioner entered into his first cash and carry silver transaction in December 1973. In total, petitioner entered into four series of silver cash *183 and carry transactions with Rudolf Wolff during the years 1973 through 1975, all of which involved alleged loans from I. Rochester, Ltd. in connection with the purchase of silver. In his initial series of transactions, petitioner's transaction documents dated December 21, 1973 confirm a purchase of 20,000 ounces of spot silver at a total cost of 26,960 British pounds, or 134.8 pence per ounce; and a short sale of 20,000 ounces of silver for delivery on July 22, 1974 at a total price of 29,220 British pounds or 146.10 pence per ounce. Rudolph Wolff handled all the loan arrangements with I. Rochester, and petitioner received all of his loan documents from Rudolph Wolff. In connection with petitioner's initial purchase of 20,000 ounces of silver, he received the following letter from I. Rochester (Finance) Ltd. dated December 19, 1973: Dear Mr. Hirai, We confirm having agreed to make the following loan to you commencing today. Amount: [British pounds] 26,960.00 Interest: 14% Due Date: 22nd July 1974 This loan is for the exclusive purpose of financing your purchase of 20,000 ounces of bullion silver from Rudolf Wolff & Company Limited, London, and you have asked us to transfer the full *184 amount of the loan to your account with said Company. It has further been agreed that you will irrevocably instruct Rudolf Wolff & Company, London, to repay the amount of our loan directly to us from the proceeds of the sale of your silver bullion. This company, I. Rochester (Finance) Limited, agrees to look solely to the sale of said silver bullion to repay this loan, it being understood that the loan is being made without recourse to you. We shall debit you separately for the interest, which shall be due immediately. Kindly sign copy of this letter to signify your full agreement to the above terms. For and on behalf of I. Rochester (Finance) Ltd Thus, pursuant to this letter, the entire purchase price of 26,960.00 British pounds for the purchase of the initial 20,000 ounces of spot silver was allegedly transferred to petitioner's account with Rudolf Wolff by I. Rochester, Ltd. According to the terms spelled out in the letter, petitioner was not responsible or personally liable for the repayment of the loan. Instead, I. Rochester, Ltd., agreed to look solely to the proceeds from the sale of the 20,000 ounces of silver for repayment of the loan which was to be made by Rudolf Wolff *185 directly to I. Rochester, Ltd. Repayment of the loan was due on July 22, 1974, the date corresponding to the delivery date for petitioner's short sale position in the first transaction series; however, the interest on such loan was due immediately. Under the terms of the loan arrangement, petitioner did not have personal possession or control over the loan principal or the proceeds from the sale of silver committed to the repayment of the loan. In a separate,undated letter captioned "Debit Notice," I. Rochester billed petitioner for $5,086, representing interest at 14 percent on the loan balance of 26,960 pounds for a period of 213 days from December 21, 1973 through July 22, 1974. [2] In addition, petitioner also received another separate, undated letter from I. Rochester in which it acknowledged the receipt of $5,086 from him on December 21, 1973. Petitioner did not pay $5,086 of interest from his personal funds to either I. Rochester or Rudolf Wolff at any time. He did, however, claim an interest deduction in the amount of $5,086 on schedule A of petitioners' 1973 Federal income tax return. On July 22, 1974, petitioner's *186 transaction documents confirm a purchase of 20,000 ounces of silver for July 23, 1974 delivery which was used to close his initial "short" position established on December 21, 1973. The total cost of that purchase was 35,500 British pounds, or 177.50 pence per ounce. Additionally, on July 23, 1974, petitioner's transaction documents reflect a sale of the 20,000 ounces of spot silver purchased on December 21, 1973 for a total price of 35,500 British pounds or 177.50 pence per ounce. In connection with this first series of transactions, petitioners reported on their 1974 Federal income tax return a long-term capital gain of $19,686 attributable to the sale of 20,000 ounces of spot silver on July 23, 1974. In addition, petitioners also reported on the same return a short-term capital loss of $14,549 attributable to the loss on the July 22, 1974 closing of the December 21, 1973 "short" position. In his second series of transactions, petitioner's transactions documents dated May 20, 1974 reflect a purchase of 25,000 ounces of spot silver at a total cost of 51,050 British pounds or 204.20 pence per ounce; and a short sale of 25,000 ounces of silver for delivery on December 20, 1974 at *187 a total price of 55,315.41 British pounds or 221.40 pence per ounce. In connection with petitioner's purchase of 25,000 ounces of spot silver on May 20, 1974, petitioner received another letter from I. Rochester. This letter was, in form, identical to the December 19, 1973 letter and contained the same general provisions as the previous letter. It confirmed a loan to petitioner for 51,050 British pounds, representing the entire purchase price of the 25,000 ounces of spot silver from Rudolf Wolff. The interest rate stated in the I. Rochester letter was again 14 percent, with a due date of December 20, 1974. In a separate, undated letter captioned "Debit Notice," I. Rochester billed petitioner for 4,190.30 British pounds of interest in connection with its loan to petitioner of 51,050 British pounds. This letter was, in form, identical to the I. Rochester letter petitioner received in 1973 billing him for $5,086 of interest in connection with his purchase of 20,000 ounces of spot silver in that year. In addition, petitioner also received another separate, undated letter from I. Rochester which acknowledged receipt of the 4,190.30 British pounds of interest. As was the case with the *188 letter billing petitioner for such interest, the letter acknowledging receipt of such interest was identical in form to the letter he received in 1973 acknowledging receipt of $5,086 of interest from petitioner. Petitioner did not pay from his personal funds 4,190.30 British pounds of interest to either I. Rochester or Rudolf Wolff at any time. However, unlike 1973, petitioners did not claim an interest deduction with respect to the 1974 loan from I. Rochester for the purchase of 25,000 ounces of spot silver. On December 20, 1974, petitioner's transaction documents confirm a sale of the 25,000 ounces of spot silver purchased on May 20, 1974 for a total price of 55,315.41 British pounds or 221.40 pence per ounce. Thus, petitioner's transaction documents reflect a paper profit of $4,265.41 on the sale of the 25,000 ounces of spot silver purchased on May 20, 1974. However, concurrent with this sale, petitioner's transaction documents also reflect a purchase of 25,000 ounces of silver for December 20, 1974 delivery at a total cost of 55,315.41 British pounds or 221.40 pence per ounce. This silver was used to close petitioner's "short" position established on May 20, 1974. Petitioners *189 did not report any capital gains or losses in 1974 attributable to the sale of the 25,000 ounces of spot silver on December 20, 1974. [3]
With respect to his third series of transactions, petitioner's Rudolf Wolff transaction documents dated June 14, 1974 reflect a purchase of 26,000 ounces of spot silver at a total cost of 50,778.00 British pounds, or 195.30 pence per ounce; and a short sale of the same quantity for delivery on January 14, 1975 at a total price of 55,033.58 British pounds, or 211.80 pence per ounce. These transactions were subsequently closed on January 14, 1975. On that date, petitioner's transaction documents confirm a sale of the 26,000 ounces of the spot silver purchased on June 14, 1974 at a total price of 55,033.58 British pounds, or 211.80 pence per ounce. Additionally, petitioner's transaction documents also reflect a purchase of 26,000 ounces of silver for January 14, 1974 delivery at a stated total cost of 55,033.58 British pounds, or 211.80 pence per ounce. Thus, petitioner's transaction *190 documents reflect a paper profit on his third series of transactions of 4,255.58 British pounds. However, petitioners failed to report any capital gains or losses in 1975 attributable to the sale of the 26,000 ounces of spot silver on January 14, 1975. The loan arrangements with respect to the financing of the purchase of the 26,000 ounces of spot silver on June 14, 1974 were identical to those in the first two series of transactions. The interest rate on the loan of 50,778 British pounds was again 14 percent, with a due date of January 4, 1975. Petitioner received both a bill and a confirmation of payment for such interest which amounted to 4,167.97 British pounds. As was the case with the two previous loans, petitioner did not pay 4,167.97 British pounds from his personal funds to either I. Rochester or Rudolf Wolff at any time. However, petitioners did not claim any interest deduction in 1974 with respect to such loan. [4] *191 The fourth series of transactions entered into by petitioner and Rudolf Wolff was initiated on August 30, 1974. On that date, petitioner's transaction documents reflect a purchase of 44,000 ounces of spot silver for September 16, 1974 delivery at a total cost of 77,748 British pounds, or 176.70 pence per ounce; and a short sale of the same quantity for delivery on April 14, 1975 at a total price of 84,339.25 British pounds, or 191.80 pence per ounce. As was the case in his prior three series of transactions, petitioner obtained financing for the entire purchase price of 77,748 pounds through I. Rochester. The interest rate on such loan was 14.5 percent with a due date of April 9, 1975. Petitioner subsequently received a bill from I. Rochester dated September 11, 1974 for $15,047.75 of interest on the loan and a confirmation of receipt of such amount from petitioner on April 14, 1975. Again, petitioner did not personally pay 14, 1975. Again, petitioner did not personally pay $15,047.75 of interest to either I. Rochester or Rudolf Wolff at any time. Petitioners did, however, claim an interest deduction of $15,048 on schedule A of their 1974 Federal income tax *192 return. Petitioner's fourth series of transactions was closed on April 14, 1975. On that date, petitioner's transaction documents reflect a sale of the 44,000 ounces of spot silver delivered on September 16, 1974 at a total price of $84,339.25 British pounds, or 191.80 pence per ounce. Consequently, petitioner's transaction documents reflect a paper profit of 6,591.25 British pounds on his sale of the 44,000 ounces of silver delivered on September 16, 1974. [5] Additionally, petitioner's transaction documents confirm a purchase of 44,000 ounces of silver at a total cost of 84,339.75 British pounds, or 191.80 pence per ounce. This silver was used to close Hirai's "short" position established on September 16, 1974. Petitioner did not personally select any of either the dates or prices in the four series of transactions and never had physical possession of any silver. In a letter from Rudolf Wolff dated September 3, 1974, petitioner was advised that "as agreed" a number of different trades had been put on by Rudolf Wolff for his account "to cover our fees," resulting *193 in a $250 debit. In response to that letter, petitioner wrote a personal check on October 10, 1974 for $250 payable to Rudolf Wolff and Co., Ltd. Subsequently, in a May 8, 1975 letter from Rudolf Wolff, petitioner was advised that he owed Rudolf Wolff an additional 742.23 British pounds in connection with his recent silver transactions. Petitioner believed these charges were for commissions and storage fees. On May 27, 1975 petitioner wrote a personal check payable to Rudolf Wolff and Co., Ltd., for $1,706.39 to cover the charges set out in the letter of May 8, 1975. The October 10, 1974 and May 27, 1975 checks were the only monies ever paid by petitioner to either Rudolf Wolff or I. Rochester. In a letter dated October 12, 1976 from Mr. James Gourlay's London office, petitioner was, in response to his request, provided with a summary of his silver transactions. This summary detailed such transactions as follows:
MR. GEORGE T. HIRAI - SUMMARY OF SILVER TRANSACTIONS
[6]
Dr.
Cr.
May 20, 1974
Purchase 25,000 ozs silver at
51,060.00
204.20
December 20, 1974
Sale 25,000 ozs silver at 221.40
55,315.41
Interest amount paid (to I
4,190.30
Rochester)
Rent and insurance charge
21.87
Management fee
262.75
Cash received
209.51
June 14, 1974
Purchase 26,000 ozs silver at
50,778.00
195.30
January 14, 1975
Sale 26,000 ozs silver at 211.80
55,033.58
Interest amount paid (to I
4,167.97
Rochester)
Rent and insurance charge
22.75
Management fee
273.26
Cash received
208.40
September 16, 1974
Purchase 44,000 ozs silver at
77,748.00
176.70
April 14, 1975
Sale 44,000 ozs silver at 191.80
84,339.25
Interest amount paid (to I
6,486.10
Rochester)
Rent and insurance charge
38.50
Management fee
390.50
Cash received
324.31
December 21, 1973
Purchase 20,000 ozs silver at
26,960.00
134.80
July 22, 1974
Carry 20,000 ozs silver - sold at
146.10, bought at 177.50
[7] 6,280.00
July 23, 1974
Sale 20,000 ozs silver at 177.50
35,500.00
Interest amount paid (to I
2,201.73
Rochester)
Rent and insurance charge
17.50
Management fee
132.60
Cash received
91.83
*194 The summary indicates that petitioner lost money in each of the four series of silver transactions entered into with Rudolf Wolff. Such losses appear in the summary under the designation of "cash *195 received" and correspond to the two checks written by petitioner to Rudolf Wolff. In his notice of deficiency, respondent disallowed petitioners' claimed interest deductions of $5,086 and $15,048 for the taxable years 1973 and 1974, respectively. In his notice of deficiency, respondent explained the reason for such adjustments as follows: It is determined that the interest deduction of $5,086.00 in 1973 and the interest deduction of $15,048.00 in 1974 claimed by you in connection with the above transactions are not deductible under Section 163 of the Internal Revenue Code, because you have not established a bona fide payment of interest or that the transactions were entered into for profit within the meaning of that Section, but on the contrary, it would appear that they were entered into solely or primarily to reduce income taxes by creating artificial deductions.Accordingly, your taxable income is increased $5,086.00 and $15,048.00 for the taxable years 1973 and 1974 respectively. OPINION The sole issue for our decision in this case is the deductibility of certain interest expenses incurred by petitioner in connection with his financed purchases of silver. Section 163 provides, *196 with exceptions and limitations not relevant herein, that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." For purposes of section 163, the term "interest" denotes that which is paid for the use of borrowed funds or compensation for the use or forebearance of money. Old Colony R. Co. v. Commissioner,284 U.S. 552, 560 (1932); Deputy v. Dupont,308 U.S. 488, 498 (1940). The "indebtedness" upon which such a payment is made must be an "existing, unconditional, and legally enforcible obligation." Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. per curiam 448 F.2d 1268 (9th Cir. 1971); Titcher v. Commissioner,57 T.C. 315, 322 (1971). In determining whether a payment constitutes interest on indebtedness, economic realities govern over the form in which a transaction is cast. Knetsch v. United States,364 U.S. 361, 366 (1960); Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966). In the instant case, petitioners claimed deductions amounting to $20,134 on their 1973 and 1974 Federal income tax returns for interest expenses in connection with two series of cash and carry silver transactions conducted with Rudolf *197 Wolff. [8] The transactions entered into by petitioner basically involved the alleged purchase on a wholly financed basis of spot silver along with a nearly simultaneous short sale of an equal amount of silver for delivery at a later date. Both the prices and dates of these transactions were determined by Rudolf Wolff. The financing for the alleged purchase prices of the spot silver bought in these transactions was handled by means of loans from I. Rochester, Ltd., a foreign entity. These loans were nonrecourse with repayment due on a date corresponding to the delivery date of the short sale positions established in connection with petitioner's initial purchases of spot silver. However, the interest on such loans was due immediately. Consequently, petitioner's financed purchases of spot silver were designed to yield immediate interest deductions with the eventual net gains realized on the subsequent sales of the spot silver and closing out of the short sale positions being accorded capital gains treatment. *198 The tax treatment of the so-called "cash and carry tax shelter" was addressed by Congress in section 263(g), which was added to the Code as part of the Economic Recovery Tax Act of 1981. Under section 263(g), the carrying charges of such transactions, including interest expense, are required to be capitalized. However, section 263(g) is only applicable to cash and carry straddles entered into after June 23, 1981. Therefore, since the tax years involved in the present case are 1973 and 1974, we must decide this case under the law as it existed prior to section 263(g). In the instant case petitioners contend that George Hirai entered into the silver transactions in question in order to familiarize himself with London markets, precious metals trading, and currency arbitrage. They argue that the silver transactions were bona fide, that interest was in fact paid, and that they were at risk at all times during the transactions in question. Respondent, on the other hand, contends that the silver transactions entered into by petitioner lacked economic substance and were prompted solely by petitioner's desire to achieve an interest deduction. Additionally, respondent also asserts that *199 no interest, within the meaning of section 163(a), was actually paid in connection with the transactions in question. We note at the outset that we have previously recognized that amounts denominated as interest cannot be deducted where the underlying transaction was a sham. Derr v. Commissioner,77 T.C. 708, 730 (1981). Furthermore, "Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction." Goldstein v. Commissioner,supra at 742. Petitioners bear the burden of proving that the alleged interest was in fact paid and that the transactions at issue served some purpose beyond simply generating an interest deduction. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. After a careful review of the evidence, we find that petitioners have failed to carry their burden of proof. The factual situation in the present case is very similar to one of the transactions we examined in our recent decision in Julien v. Commissioner,82 T.C. 492 (1984). In Julien, one of the taxpayers, Joel Fabiani (Fabiani), claimed interest deductions *200 in 1975 for payments made in that year on indebtedness incurred in connection with a Rudolf Wolff silver cash and carry transaction. On October 31, 1975, Fabiani purportedly purchased 254,000 ounces of spot silver at a cost of 508,254 British pounds and also sold the same quantity for January 68 1976 delivery at a price of 520,795 British pounds. Commissions on the total transaction were $662. In connection with Fabiani's purchase of spot silver, he entered into a loan agreement with I.M. Fortescue (Finance) Ltd. (Fortescue). Under the terms of this agreement, Fabiani borrowed the entire purchase price of 508,254 British pounds for 64 days at an interest rate of 13.5 percent. The loan was nonrecourse and secured solely by the spot silver purchased and the forward contract negotiated through Rudolf Wolff. On November 3, 1975 Fortescue billed Fabiani for $24,996.81 of interest on the loan, which Fabiani paid by check dated December 19, 1975. However, less than a month after Fabiani's payment of interest, the amount of such interest payment, less a $20 service charge, was refunded to Fabiani by Rudolf Wolff. In disallowing Fabiani's claimed deductions for interest payments in *201 1975, we stated: Thus, the entire transaction was put in place on October 31, 1975, with the result predetermined, namely, a $24,997 interest expense to be claimed as a deduction in 1975, and a $24,834 capital gain to be realized in 1976, all at an out-of-pocket cost of $662 * * *. * * * Both the spot silver and the forward contract were pledged to secure the loan, the loan could not be prepaid without the consent of Fortescue, the interest rate was fixed at 13-1/2 percent, and interest on the principal for the entire 64 days was required to be paid. Thus, there was no way Fabiani could have made a profit or incurred a loss by virtue of any periodic widening or narrowing of the spread, since at no time during the period of the loan could he have closed out his long position or short position or both, or in any way restructured the straddle. Fabiani does not argue, nor could he, that there was any other way to make a profit in the 1975-1976 straddle. The straddle, therefore, served no purpose beyond generating an interest deduction (Fabiani reported no capital gain as a result of closing out the straddle in 1976). * * * Fabiani's 1975 interest deduction is therefore disallowed. *202 (Fn. omitted; 82 T.C. at 507-509. In the present case, petitioner's own records indicate that he actually lost money in each of the four series of silver transactions entered into with Rudolf Wolff. In total, Hirai expended $1,956.39 more than he received in conjunction with his entering into the four silver transactions in question.[9] Admittedly, there is no stated prerequisite of the existence of a profit motive in order to obtain an interest deduction under section 163(a). Fuchs v. Commissioner,83 T.C. No. 7 at 26 (July 19, 1984); Brannen v. Commissioner,78 T.C. 471, 499-500 (1982). Nevertheless, there must be some purpose, such as the procurement of a profit, the use of funds, or the acquisition of an asset to support a deduction for interest. Goldstein v. Commissioner,supra.
Petitioner does not dispute the fact that he never had personal possession or control *203 over the funds loaned to him by I. Rochester. Rather, the proceeds of the loan allegedly were transferred directly to his account with Rudolf Wolff. Furthermore, petitioner cannot argue that the proceeds from the loan were used to acquire a fixed asset since he entered into a short sale for an identical amount of silver nearly simultaneously with each purchase of spot silver. Quite simply, petitioner never had control over the funds and he never acquired any asset from their use. Petitioner does argue that one of the purposes for his entering into the silver transactions in question was to familiarize himself with the London markets, precious metals trading, and currency arbitrage. However, it is undisputed that petitioner did not personally select any of either the dates or prices in the four series of transactions, nor did he personally arrange for the financing of such transactions. Instead, the extent of petitioner's involvement in the silver transactions conducted on his behalf by Rudolf Wolff was the merely passive receipt of the transaction documents forwarded to him by Rudolf Wolff. We simply cannot perceive any benefit petitioner could have received on a professional *204 level from his involvement in the silver cash and carry transactions herein. Additionally, petitioner never made any interest payments from his personal funds to either I. Rochester or Rudolf Wolff. In point of fact, the only funds evern transferred by petitioner to either I. Rochester or Rudolf Wolff were two checks totaling $1,956.39 for purported commissions and storage fees.Thus, for a total out-of-pocket cost of only $1,956.39, petitioners allegedly incurred interest expenses of over $20,000. Petitioners argue that the interest payments on their loans were made from their commodity trading account with Rudolf Wolff. However, the question immediately arises--where did that money come from? There is no evidence in the record that petitioner ever transferred any other monies to Rudolf Wolff, nor is there any loan documentation from Rudolf Wolff. Petitioner's statements of account from Rudolf Wolff do reflect interest debits with respect to petitioner's alleged interest payments; however, the dates of such debits are not in 1973 and 1974, when the interest payments allegedly were made for petitioner, but rather on April 23, 1975. There simply is no evidence in the record that *205 the interest payments in question ever actually were made by Rudolf Wolff in either 1973 or 1974. Admittedly, petitioner has introduced letters from I. Rochester acknowledging receipt of the interest payments here at issue. However, we find such evidence alone insufficient to carry petitioner's burden of proof that the interest payments in question were in fact made. In conclusion, a thorough review of the evidence leads us to the inescapable conclusion that the purported debts in the instant case were entered into for the sole purpose of obtaining an interest deduction. Petitioner failed to realize any profits from his transactions, the economic consequences of his transactions were predetermined and each resulted in a locked-in loss, petitioner did not have personal possession or control over the loan proceeds, and petitioner did not acquire any asset from the use of such loan proceeds. In short, the purported loans served no purpose beyond generating an interest deduction. Furthermore, petitioners have failed to carry their burden of provingthat the interest payments in question were actually made.Petitioners' interest deductions for 1973 and 1974 are thus disallowed. Decision *206 will be entered under Rule 155.
Footnotes
1. In his notice of deficiency, respondent also increased petitioners' capital gains by $4,706 for the taxable year 1974 representing the net of petitioners' claimed short-term capital loss of $14,549 and their long-term capital gain derived from the silver transactions of $19,686, less the 50-percent deduction under sec. 1202, I.R.C. 1954↩. However, although petitioners contested the entire amount of deficiency in their original petition, neither party has made mention of this issue at trial or on brief. In point of fact, respondent specifically states on brief that the sole issue for our determination is the deductibility of petitioners' claimed interest expenses. Consequently, we can only assume that this issue has been previously settled by the parties.
2. The exchange rate used in the debit notice was $2.31 per pound.↩
3. At trial, petitioner explained that he did not report any tax consequences from the second series of silver cash and carry transactions because he lost the documents.↩
4. As was the case with the tax consequences concerning the second series of transactions, petitioner's explanation for his failure to report any tax consequences from the third series of silver cash and carry transactions was that he lost the documents covering such transactions.
5. Petitioners reported a $13,052 long-term capital gain in 1975 attributable to the sale of the 44,000 ounces of silver.↩
6. All amounts are in British pounds. ↩
7. Although the summary reproduced above is basically identical to the one introduced in evidence at trial, there were a couple of numerical errors in the exhibit which we have taken the liberty of correcting for the sake of accuracy. The figure for the carrying cost of petitioner's short sale position in his first series of transactions which he covered on July 22, 1974 was incorrectly stated to be 6,298.26 British pounds on the original exhibit. The correct number and the one shown on our summary is 6,280 British pounds which represents the difference between the price petitioner originally sold 20,000 ounces of silver short for on Dec. 21, 1974 of $146.10 pence per ounce or 29,220 British pounds and of 177.50 pence per ounce or 35,500 British pounds. This change of 18.26 British pounds necessarily reduces the figure for cash received from 110.09 British pounds, the amount shown on the original exhibit, to the correct amount of 91.83 British pounds.↩
8. As discussed in our findings of fact, petitioner actually entered into four series of transactions; however, he only reported the tax consequences from the first and fourth series.↩
9. The amount of $1,956.39 represents the total amount of the two checks written by petitioner during 1975 to Rudolf Wolff. There is no evidence in the record that petitioner ever received any payments back from Rudolf Wolff. Consequently, it appears that petitioner's net transaction loss before taxes was that $1,956.39.↩